SALES DRIVERS, HELPERS & BUILDING CONSTRUCTION DRIVERS, LOCAL UNION 859, OF INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA, AFL, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 12605.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 14, 1955.

Decided Dec. 8, 1955.

Mr. Herbert S. Thatcher, Washington, D. C., with whom Mr. Drexel A. Sprecher, Washington, D. C., was on the brief, for petitioner.

Mr. Norton J. Come, Attorney, National Labor Relations Board, of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of Court, with whom Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, was on the brief, for respondent.

Before PRETTYMAN, BAZELON and FAHY, Circuit Judges.

FAHY, Circuit Judge.

On findings of fact based upon a stipulation among the appellant Union, the General Counsel of the National Labor Relations Board, and the Associated General Contractors of America, Inc., Georgia Branch, the Board entered an order against the Union requiring it to

cease and desist conduct found to violate section 8(b) (4) (A) of the Taft-Hartley Act, the so-called secondary boycott provision.[1] The Union petitions us to set aside the order and the Board petitions us to enforce it.

The case involves picketing at sites shared by the struck employer and neutral employers. The pertinent findings of fact contained in the Board's decision are in substance as follows: Campbell Coal Company is engaged in the sale of building materials including ready-mixed concrete. It operates two ready-mix concrete plants in Atlanta, where it employs, among others, men who drive trucks by which Campbell delivers its ready-mix to construction sites. At the delivery points the truck drivers at the direction of the contractors on those sites operate the unloading mechanism of the truck so as to place the ready-mix at places and in receptacles designated and provided by the contractors. Frequently the unloading is accomplished by pouring the mixture into forms so placed that when dry the mixture becomes part of the structure on the project. The drivers spend approximately 25 per cent of their working time at their employer's plants, 25 per cent en route, and 50 per cent at construction sites.

The Union initiated a strike against Campbell because of the discharge of a number of the truck drivers. It picketed the two ready-mix plants. In addition the pickets followed some of the trucks from the plants to various construction projects where the trucks made deliveries, although the Union had no dispute with any of the contractors on such projects. It is this latter picketing which the Board found to be illegal. The pickets carried signs which read as follows:

> "Employees of Campbell Coal Company on strike in protest of discharges against Union employees. Sales Drivers, Helpers and Building Construction Drivers, Local 859, AFL."

The picketing continued so long as Campbell's trucks remained on the construction site and was confined to the immediate area of the trucks or as close as the pickets could get without trespassing on private property. Except for displaying the picket signs, the Union's pickets did not communicate with any employees working at the projects.

On these findings [2] the Board reached the conclusion that section 8(b) (4)

---

1. This section provides:

    "(b) It shall be an unfair labor practice for a labor organization or its agents—

    \*　\*　\*　\*　\*

    "(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person *to cease using, selling, handling, transporting* or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person \*　\*." 61 Stat. 141 (1947), 29 U.S.C. § 158 (b) (4) (A) (1952), 29 U.S.C.A. § 158 (b) (4) (A).

2. Some additional facts are contained in the stipulation but are not the subject of findings by the Board. No contention in this court is made by the Board upon the basis of these facts, although some of them are enumerated in its brief. These are that at each construction site the Union agent advised the contractor or his representative of the dispute with Campbell and asked him not to accept delivery of the concrete. If delivery was refused the Union took no further action, but if accepted the Union agents picketed the immediate area of the trucks with the signs already described. The picketing continued while Campbell's trucks remained on the construction site. In some instances employees of the contractors working on the construction projects quit work for the duration of the picketing, assigning as the reason therefor the presence of the picket signs. The Union agents did not inform employees who quit or other employees on the projects that the picketing was not intended as

(A) was violated because the picketing was conducted "to force secondary employers located on such [construction] projects to cease doing business with Campbell, by inducing and encouraging the employees of said employers to engage in a strike * * *."

In so ruling the Board said it relied upon "the reasons stated in Washington Coca-Cola, 107 NLRB No. 104 [p. 299], affirmed in Thurston Motor Lines, Inc., 110 NLRB No. 122 [p. 748] * * *." It considered without merit the Union's defense that its picketing of the construction projects was within the area of permissible conduct recognized by the Board in Moore Dry Dock Company, 92 N.L.R.B. 547. In that case the Board laid down certain conditions which a union must meet in order for its picketing to be lawful where the site picketed is shared by the primary employer and neutral employers. These conditions are that the picketing disclose clearly that the dispute is with the primary employer only, that the picketing is limited to times when the dispute situs is on the neutral employer's premises, that the primary employer is engaged in its normal business at the common situs when the picketing takes place, and that the picketing is confined to areas reasonably close to the situs of the dispute. The Union here contends that it has met these conditions but that the Board has added another and absolute prerequisite that no situs for effective picketing other than

the common one be available. While in Moore Dry Dock it was a fact that no such separate situs was available, the Board decision did not specify this as one of the conditions for lawful picketing at a common situs. We agree with the Union that in the case at bar the Board has added this condition and has applied a rigid rule that when another such separate situs is available picketing at a common situs is prohibited. This is borne out by the findings relied upon by the Board, above set forth, by its brief in support of its decision, and by the reasoning of the decision itself. As to the latter, the Thurston case is expressly relied upon. There the Board held that picketing at a common situs was unlawful "when the employer has a primary place of business in the locality which can be picketed by the labor organization with which the employer has a dispute." 110 N.L.R.B. at page 754. Since there was such a separate situs it was concluded that the picketing at the situs which was common to the struck employer and the secondary employer was not primary, but was "an attempt to induce and encourage the employees of various secondary employers to engage in a strike or a concerted refusal in the course of their employment to handle or work on Thurston's goods or perform services involving Thurston's goods, an object thereof being to require such secondary employers to cease doing business with Thurston."[3] Ibid.

an appeal to them not to work, but pickets did not speak to or communicate with any employees on the projects other than by displaying the picket signs, or in any manner threaten, coerce, or intimidate the employees to quit work or offer any other form of inducement or encouragement so to do.

3. Although these statements are taken from the trial examiner's findings of fact, they must be regarded as proper expressions of the rule upon which the Board depends in the instant case. In the first place, the Board in Thurston adopted these findings. And in the second place, any other conclusion would rob of meaning the Board's reliance in the instant case upon "the reasons * * * affirmed in Thurston Motor Lines, Inc.

* * *" since the Board gave no independent expression of reasons for the Thurston decision. It is true that the examiner assigned an alternative reason in Thurston, namely, that another Moore Dry Dock requirement was absent inasmuch as the picketing did not clearly disclose that the dispute was with the primary employer only. But the Board could not have intended to refer to this reason as applicable to the instant case, since here the picket signs were clear and there were no attempts by those picketing to induce employees of neutral employers not to cross the picket line, as there were in Thurston. Moreover, the Board's brief, discussed in the text infra, demonstrates beyond doubt that the rule relied upon is the one above outlined.

In Washington Coca-Cola, supra, decided before Thurston, and now also relied upon, the Board answered a union's contention that certain picketing was protected by the Moore Dry Dock rule by holding the rule inapplicable whenever the struck employer has a permanent place of business at which picketing can be effectively carried on.

Finally, we consider the Board's brief. It states:

"Accordingly, the question is not * * * whether 'the dispute reaches to the area which is being picketed,' but whether Campbell, the primary employer, had separate premises in the area which provided the Union with a fixed and adequate base for carrying on its primary activity. The record shows that, like the company in Coca-Cola, supra, it did have such premises. * * * In these circumstances the Board's common situs rules are inapplicable, there being no excuse, other than the impermissible one of increasing the effectiveness of the picketing, for allowing the Union to extend it to the construction projects and thereby involve neutral employers in its dispute with Campbell."

Affirmance by this court of the Coca-Cola order, sub nom. Brewery and Beverage Drivers and Workers Local Union No. 67 v. N.L.R.B., 95 U.S.App.D. C. 117, 220 F.2d 380, did not constitute approval of the rule now advanced by the Board, but must be construed only as agreement with the conclusion the Board there reached, which rested in considerable part upon additional findings. Here, in contrast, the decision rests solely upon the fact that Campbell had other places of business, not common with a neutral employer, which could be and were being picketed.[4] Yet Campbell's employees worked at these places only about 25 per cent of their time and spent 50 per cent with the trucks at places where Campbell did business coincidently with neutral employers. Section 8(b) (4) (A) does not contain a provision which condemns concerted activity of employees with respect to their own employer merely because it occurs at a place where it comes to the attention of and incidentally affects employees of another, even where the activity could be carried on at a place where the primary employer alone does business. The existence of a common site, of such incidental effect, and of another place which can be picketed, are factors to be considered in determining whether or not the section has been violated, but alone are not conclusive.[5] The presence of these factors does not warrant a failure to consider other facts which are relevant and perhaps countervailing. See N.L.R.B. v. General Drivers, Warehousemen and Helpers, Local 968, 5 Cir., 225 F.2d 205, at pages 209–210. No rigid rule which would make these few factors conclusive is contained in or deducible from the statute. To read it into the statute by implication would unduly invade the application of section 13 [6] which preserves the right to strike "except as specifically provided" in other provisions of the Act. It is not specifically provided that picketing at a common site, with an incidental effect upon employees of a neutral employer, is unlawful in every case where

4. These were not the only factors considered by the Board in its decision recently upheld in N. L. R. B. v. Associated Musicians of Greater New York, Local 802, 2 Cir., 1955, 226 F.2d 900. In that case requests were made by Union representatives that the secondary employers cease doing business with the primary employer. This was true in the present case, but was not relied upon by the Board. See note 2 supra. There are also other factual distinctions between the two cases.

5. In addition to Moore Dry Dock, supra, see Schultz Refrigerated Service, 87 N.L. R.B. 502; Oil Workers International Union (The Pure Oil Co.), 84 N.L.R.B. 315; N. L. R. B. v. Service Trade Chauffeurs, 2 Cir., 191 F.2d 65; N. L. R. B. v. Local Union No. 55, 10 Cir., 218 F.2d 226.

6. 61 Stat. 151 (1947), 29 U.S.C. § 163 (1952), 29 U.S.C.A. § 163.

picketing could also be conducted against the primary employer at another of its places of business.

This view has been set forth at length in N.L.R.B. v. General Drivers, Warehousemen and Helpers, Local 968, 5 Cir., 225 F.2d 205, certiorari denied 350 U.S. 914, 76 S.Ct. 198, 100 L.Ed. ——. There the labor dispute involved four warehouse employees who occasionally made deliveries to construction sites where the remainder of the employer's work force was engaged. Employees of neutral employers were also working at these sites, but not at the primary employer's warehouse. Nevertheless, these common sites were picketed along with the warehouse, regardless of whether any of the four employees made deliveries to the construction projects. The picket signs together with pamphlets distributed by the pickets showed that the strike was against only the primary and no other employer, and that the picket line should be considered as directed only towards those locations within the projects where primary employees were working. The court held the Board erred in concluding that the Union was in violation of section 8(b) (4) (A) merely upon the basis of findings that "the drivers and warehousemen involved were employed 'not at the construction projects but at the Otis Massey [the primary employer's] warehouse,' so that the warehouse location was the sole 'situs of the union's dispute,' and the place where it could 'adequately publicize' its private controversy with [the primary employer] without disrupting work of the other neutral employers." Id. at page 208. Although such a finding as to situs, arrived at in part by applying the same "adequate publicity" rule here proposed, brought the case within the Moore Dry Dock criterion barring picketing at a common situs which is not the situs of the dispute, the court said that the approval which had been given by the courts to the standards set forth in Moore Dry Dock for lawful picketing at a common site,

" * * * was necessarily based upon substantial evidence that the unlawful objective denounced by the statute actually existed, rather than upon the inferentially suggested theory that this ultimate and controlling statutory inquiry may be effectually supplanted merely by Board findings that the real 'situs' of a labor dispute exists at a location other than that determined by the conduct of the parties, at which place alone it may be 'adequately' publicized with impunity under the Act, and thereby inferring from such findings, as here, that the unlawful objective exists. Indeed, such a theory would, we think, elevate the Board formulated 'criteria' by judicial fiat to a vantage point from which it could, in effect, circumvent the statute, for in this type instance it would substitute Board inferences as to the lawfulness or unlawfulness of an objective, based purely on its own judgment as to the propriety and adequacy of the means employed in a labor dispute, for the sole statutory test of unlawfulness of the end or objective sought, contrary to the Supreme Court's pronouncements that it is ' "the objective of the unions' secondary activities * * * and not the quality of the means employed to accomplish that objective, which was the dominant factor motivating Congress in enacting that provision." ' International Brotherhood of Electrical Workers, Local 501 v. N.L.R.B., 341 U.S. 694, 704, 71 S.Ct. 954, 959, 95 L.Ed. 1299 * * *." 225 F.2d at pages 209–210.

We agree with this analysis. In this case the Board does not even press the contention that the existence of a separate situs of the primary employer causes the Moore Dry Dock standards to bar picketing at a common situs. Rather it seems to assert that these standards need not be considered if effective picketing can be conducted at a situs not com-

mon. Nevertheless, this difference of approach and whatever factual differences exist between Brewery and Beverage Drivers and this case do not render the Fifth Circuit's reasoning any less pertinent. A violation of section 8(b) (4) (A) is not to be found by a rule of decision based upon findings which are inadequate to support the conclusion reached.

Since the decision of the Board, as shown by its findings and reasoning, turns upon the fact of concerted activity at a common situs where one not common was available, we will set aside the order, notwithstanding the picketing had incidental effect upon employees of neutral employers, but will remand the case to the Board for its further consideration, if desired. Otherwise our decision would constitute an approval of a rigid rule which the language of the statute does not support.

It is so ordered.