Charles T. DOUDS, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL NO. 976, AFL; International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Joint Council No. 67, AFL; and Butter, Eggs, Cream and Cheese Drivers, Route Salesmen, Helpers and Handlers, Local No. 277, of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL, Respondents.

United States District Court
S. D. New York.
Jan. 17, 1956.

■■■■■■■■■■■■■■■■

———◆———

Theophil C. Kammholz, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Winthrop A. Johns, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., John J. Cuneo, Chief Law Officer, Region 2, Leonard S. Kimmel, Atty., N. L. R. B., New York City, William W. Kapell, Atty., N. L. R. B., Washington, D. C., for petitioner.

Cooper, Ostrin & De Varco, New York City, Clarence Beck, Salt Lake City, Utah, for International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 976, AFL and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Joint Council No. 67, AFL, Respondents.

Herman E. Cooper, George A. Nicolau, New York City, of counsel.

HERLANDS, District Judge.

This motion for a "10-*l*" temporary injunction has been brought on by an order to show cause filed by petitioner, the National Labor Relations Board, pursuant to section 10(*l*) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 141 et seq., herein called "the Act."

Petitioner seeks to enjoin respondents "from engaging in certain acts and conduct" alleged to be "in violation of the National Labor Relations Act, as amended, pending the final adjudication of the N. L. R. B., with respect to such matters." The specific provision of the Act alleged to have been violated is section 8(b), subsection (4) (A), herein called "8 b 4 A."

The three separate respondents—all of whom are sister locals affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. L.—are: (1) Local No. 976; (2) Joint Council No. 67; and (3) Local No. 277, Butter, Eggs, Cream and Cheese Drivers, Route Salesmen, Helpers and Handlers.

There are two charging parties: Cache Valley Dairy Association (herein sometimes called "Cache") and Dairy Distributors, Inc. (herein sometimes called "Distributors"). Both charging parties are "the primary employers" and will sometimes be referred to in this opinion as such.

The order to show cause, signed on October 13, 1955, was made returnable on October 25, 1955. It provided for respondents to file their answers to the petition on or before October 21, 1955, and for the forthwith service by a United States Marshal of the order to show cause and its supporting papers upon each of the three respondents and upon the two charging parties.

Personal service was made upon Local No. 277 through its president on October 14, 1955. This union is located in New York City; and it will be sometimes referred to in this opinion as "277" or "the New York City local."

Personal service was made on October 17, 1955 upon Local No. 976 and Joint Council No. 67, through one Milo Rash, who is the secretary of the former and the trustee of the latter. These two unions will be sometimes referred to in this opinion as "the Utah unions."

Service by registered mail was made on October 13, 1955 on the two charging parties, who are the primary employers.

Hearings and argument on the issues raised by the petition and answer were duly held on November 2, 1955 and December 14, 1955. The Court has fully considered the petition, answer, evidence, and argument and briefs of counsel.

Upon the entire record, the Court makes the following findings of fact and conclusions of law:

### Findings of Fact

1. Petitioner is Regional Director of the Second Region of the National Labor Relations Board, an agency of the United States, and filed the petition herein for and on behalf of the Board.

2. Respondent Local No. 976, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL; and respondents Joint Council No. 67, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL and Local 277, Butter, Eggs, Cream and Cheese Drivers, Route Salesmen, Helpers and Handlers, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL, are unincorporated associations and are labor organizations within the meaning of sections 2(5), 8(b) and 10(l) of the Act; and at all times material herein, respondents have been engaged within this judicial district in transacting business and in promoting and protecting the interests of their employee members and employee members of affiliated local unions. Local 976 and Joint Council No. 67 will be called herein "the Utah unions." Local 277 will be called herein the "New York City union."

3. On or about September 29, 1955, Cache and Distributors, pursuant to the provisions of the Act, filed amended charges with the Board to charges originally filed with the Board on September 2, 1955; and said amended charges allege that respondents have engaged in and are engaging in unfair labor practices within the meaning of 8 b 4 A.

4. Said charges and amended charges were referred to petitioner as Regional Director of the Second Region of the Board for investigation and were investigated by petitioner under his supervision.

5. There is, and petitioner has, reasonable cause to believe that:

(a) Cache, one of the primary employers, is the largest Swiss cheese processor and producer in the world. Its factory, located at Smithfield, Utah, employs ninety workers. It is a dairy cooperative, organized under the laws of Utah as a non-profit corporation. Its membership consists of approximately 1600 dairy farmers in the area. It sells and ships annually, dairy products valued at more than $1,000,000 to customers outside Utah.

(b) Distributors, the other primary employer, a Utah corporation also located at Smithfield, Utah, is a wholesale distributor of the cheese and other dairy products manufactured by Cache Valley Dairy Association, with which it is closely affiliated. It employs eight workers. Its principal function is to transport the cheese to other distributors in various cities, including N. Dorman & Co., Inc. in New York City. It sells and ships annually, dairy products valued at more than $1,000,000 to customers outside Utah.

(c) The secondary or neutral employer involved in this proceeding is the above-mentioned New York City firm known as N. Dorman & Co., Inc. It will be referred to in this opinion as "Dorman" or "the secondary employer." It is a dealer in cheese and dairy products. It was a regular (and the largest single) customer of the primary employers. It sells and ships annually, in excess of $50,000 of its products outside New York State. It distributes dairy products to chain stores and jobbers.

(d) The genesis of the dispute between Cache and Utah unions goes back to 1951. During each of the years from 1946 to 1950, Cache had entered into labor union contracts. During 1951 and 1952, unresolved negotiations and meetings led to a strike on May 14, 1952 and to charges by Local No. 976 that Cache and its manager and controlling executive (one Edwin Gossner) had committed unfair labor practices by, *inter alia,* refusing to bargain collectively with that local as the exclusive employees' representative. An N. L. R. B. trial examiner's report issued November 28, 1952, was adopted by the Board on March 4, 1953 (Respondents' Exhibit 1, Hearing of November 2, 1955, p. 66). No contract has been made between Local No. 976 and either Cache or Distributors since 1951.

(e) For several months past, commencing in or about July 1955, the Utah unions have been engaged in a campaign

to organize the employees of the primary employers and to obtain recognition as the collective bargaining representative of their employees.

(f) In furtherance of the objective set forth in subparagraph "(e)" above, the Utah unions, on or about July 26 and July 27, 1955, picketed alongside of a truck of Distributors at the premises of Dorman in New York City while Distributors was attempting to deliver Cache products to Dorman. The picket signs carried during this picketing read as follows:

"Notice: Cheese carried and delivered by this truck has been worked, processed by non-union employees of the Cache Valley Dairymen's Association, Smithfield, Utah."

and was signed, "Teamsters Joint Council No. 67."

(g) That on or about July 28, 1955—the day after one Arthur Nigro (an employee of the secondary employer) had helped unload a Dairy Distributors' truck which had been picketed—Nigro met with one Ristuccia, the president of Local 277, who told him that he did not think that Nigro should have unloaded the truck, and that he could have brought Nigro up on charges; but that no charges were ever brought.

(h) That in the early part of August 1955, a truck owned by Mid-States Trucking Company, came to the secondary employee with a load of Cache cheese; that Harry Rosen (a foreman-employee of the secondary employer) asked said Ristuccia, whether the truck should be unloaded; that Ristuccia asked to see the driver of the truck; and that the truck was not unloaded that day.

(i) That on or about September 1, 1955, one John Gredell (an employee of the secondary employer) in the company of a fellow employee (George Stewart), was asked by said Ristuccia whether a truck from Utah had come in that day; that Gredell answered that it had not; and that Ristuccia replied, "I don't think you should unload it."

(j) On October 31, 1955, respondents Local 976 and Council No. 67, again picketed alongside of a truck of Distributors at the premises of Dorman in New York City, while Distributors was attempting to deliver Cache products to Dorman. On this occasion, the pickets carried signs reading as follows:

"Notice: The owner of this truck, Dairy Distributors, and the makers of the products carried by it, Cache Valley Dairymen's Association, Smithfield, are unfair to Teamsters Joint Council No. 67."

(k) In furtherance of the objective set forth in subparagraph "(e)" above, the Utah unions, on July 26 and July 27, 1955 and on October 31, 1955, requested employees of Dorman not to handle, work on or process Cache's products.

(1) An object of the conduct of the Utah unions set forth in subparagraphs "(f)" and "(j)," was to force or require Dorman to cease handling, using, processing and otherwise dealing in Cache's products, and to cease doing business with Cache and/or Distributors.

(m) Prior to the commencement of the picketing, there was a meeting in New York attended by representatives of the two Utah unions and the New York City local and representatives of the secondary employer, at which time the three unions made a request of the secondary employer to buy his cheese elsewhere than from Cache in order to obtain the secondary employer's assistance in bringing pressure to bear on the primary employers for recognition.

(n) On July 26, 1955, the employees of the secondary employer refused to unload the primary employers' truck and their cheese. Deliveries of Cache products were effected to Dorman on July 27 and October 31, 1955.

(o) On October 25, 1955, the return date of the order to show cause, the New York City union (Local No. 277) entered into a formal written stipulation, whereby it consented to a cease and desist order, subject to petitioner's approval. The present motion was with-

drawn by petitioner in so far as it relates to the New York City local.

The stipulation (and the order and decree to be entered pursuant to it) requires the New York City local to cease and desist from "engaging in, and by picketing, requests, appeals, orders, directions, instructions, and other means from inducing or encouraging the employees" of the secondary employer "to engage in strikes or concerted refusals in the course of their employment to use, manufacture, process, transport or otherwise handle or work on any goods, articles, materials or commodities, or to perform services" for the secondary employer "for the object of forcing or requiring" the secondary employer "to cease using, selling, handling, transporting, purchasing, or otherwise dealing in the products" of the two Utah primary employers "or to cause" the secondary employer "to cease doing business" with the primary employers.

The stipulation also requires the New York City local to post conspicuously for sixty days, a notice, the text of which was agreed upon. The notice, which is captioned "Notice to all Members," refers to the N. L. R. B. decision and order based upon the stipulation for a consent decree, and notifies the employees who are members of Local 277 that "We will not engage in, * * * requests, appeals, orders, directions, instructions and other means to induce or encourage the employees of N. Dorman & Co., Inc. * * * to engage in strikes or concerted refusals in the course of their employment to * * * handle or work on any goods * * * or to perform services * * * for the object of forcing or requiring N. Dorman & Co., Inc. * * * to cease using, selling, handling, transporting, purchasing, or otherwise dealing in the products of Cache Valley Dairy Association and/or Dairy Distributors, Inc."

Paragraph 10 of the stipulation contains the following recital: "* * * it is understood that the signing of this stipulation by the Respondent Union does not constitute an admission that it has violated the Act."

(p) The time spent in picketing alongside Distributors' truck at Dorman's premises on July 26 and July 27 and October 31, 1955, totaled about three and one-half hours.

(q) The principal and sole office of Local 976 is at Ogden, Utah, in the neighborhood of 50 miles from the situs of the Cache plant.

(r) The principal office of Council 67 is located at Salt Lake City, Utah, approximately 90 miles from the Cache plant.

(s) Neither Cache nor Distributors owns, operates, or maintains any place of business other than their respective facilities and installations in the State of Utah.

(t) Edwin Gossner filed an election petition on August 26, 1955; Local 976 consented to an election for September 7, 1955; no election was held. On September 16, 1955, Cache announced that its cheese-making operation would shut down, and about ten employees of Cache were laid off.

(u) After, but not prior to that announcement, picketing took place at the Cache plant, the pickets being some of the laid-off employees, together with some of the union's agents.

(v) The picketing was carried on less than a city block from the door to the plant. Such picketing has received wide and national publicity. The picketing activity at the primary location of the Cache operations has resulted in the four major western common-carrier truck lines refusing to come in and pick up Cache's products.

(w) The Cache plant is located about ninety miles north of Salt Lake City and about two miles from the city limits of Smithfield, a city having a population of 3,000 and 20 or 30 business establishments. There is a paved road to the plant from Smithfield; a road leads into the plant; and there is a road completely around the plant. The respondent-

Utah unions have a situs for effective picketing in Utah.

(x) The Cache operation involves approximately 80 trucks, which deliver retail milk and cheese, haul milk from the farmers to the plant to manufacture cheese. Twenty trucks operate retail milk and dairy products routes to Utah residents and to stores. The total truck traffic each day is 50 trucks. Ten trucks are engaged in making the wholesale run for Cache.

(y) The only trucks which have been picketed have been Distributors'.

(z) The respondent-Utah unions have engaged in and have induced and encouraged the employees of the secondary employer (Dorman) to engage in strikes and concerted refusals in the course of their employment to use, transport or otherwise handle or work on the goods, articles, materials and commodities of the primary employers (Cache and Distributors) and to perform services in connection with such goods, articles, materials and commodities.

(aa) An object of respondent-Utah unions' conduct set forth above has been and is to force or require Dorman to cease using, selling, handling, transporting or otherwise dealing in Cache's products and to cease doing business with Cache and/or Distributors.

(bb) At no time material herein have the respondent-Utah unions had any dispute whatever with Dorman concerning the wages or terms or conditions of employment of Dorman's employees.

(cc) The acts and conduct of the respondent-Utah unions set forth above in connection with the operations between the primary employers and the secondary employer, have a close, intimate and substantial relation to trade, traffic and commerce among the several states, and tend to lead to labor disputes burdening and obstructing commerce and the free flow of commerce.

6. It may be fairly anticipated that, unless restrained, respondent-Utah unions will repeat or continue the acts and conduct set forth or referred to in sub-paragraphs (f), (j), (k), (l), (m), (p), (z), (aa) and (cc) of paragraph 5 above, or similar or like conduct, an object thereof being to force or require the secondary employer to cease using, selling, handling, transporting or otherwise dealing in the products of the primary employers or to cease doing business with such primary employers.

### Conclusions of Law

There is, and petitioner has, reasonable cause to believe that:

1. The primary employers and the secondary employer have been and are engaged in commerce within the meaning of section 2(6) and (7) of the Act.

2. Respondent-Utah unions are labor organizations within the meaning of sections 2(5), 8(b), and 10(l) of the Act.

3. This Court has jurisdiction of the parties and of the subject-matter of this proceeding, and is empowered to grant injunctive relief under section 10(l) of the Act.

4. Respondent-Utah unions have engaged in, and are engaging in, unfair labor practices within the meaning of section 8(b) (4) (A) of the Act, affecting commerce within the meaning of section 2(6) and (7) of the Act, and a continuation of such practices will impair the policies of the Act as set forth in section 1(b) thereof.

5. To preserve the issues for the determination of the Board as provided in the Act, and to avoid irreparable injury to the policies of the Act and to the public interest, it is appropriate, just and proper that, pending the final adjudication of the Board with respect to this matter, respondent-Utah unions, their officers, agents, servants, representatives, employees, members, attorneys, and all persons acting in concert or participation with them, be enjoined and restrained from the commission of the acts and conduct set forth or referred to in Findings of Fact 5(f), (j), (k), (l), (m), (p), (z), (aa), and (cc) above, acts in furtherance or support thereof, and like or related acts or con-

duct, the commission of which in the future may fairly be anticipated from respondent-Utah unions' acts and conduct in the past.

The foregoing findings and conclusions must be viewed in the light of the principles laid down by the controlling statutory provisions and judicial decisions.

This case presents another phase of the problem of reconciling "the competing claims of unions to strike and of bystanders to be free of harm from so-called 'secondary boycotts.'" Circuit Judge Frank, in N. L. R. B. v. Service Trade Chauffeurs, etc., 2 Cir., 1951, 191 F.2d 65, 67.

The statute preserves the right to strike "except as specifically provided for herein." Section 13 of the Act, 29 U.S.C.A. § 163, declares:

"Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right."

■ In accordance with this general Congressional mandate, the courts are required to protect the right to strike; they may neither "interfere with" nor "impede" nor "diminish" that right "in any way", *except* as *specifically* provided in the Act. See N. L. R. B. v. International Rice Milling Co., Inc., 1951, 341 U.S. 665, 672–673, 71 S.Ct. 961, 95 L.Ed. 1277.

■ Traditional canons of statutory interpretation predicate the view that the general provision in favor of the right to strike should be liberally construed, while the proviso in derogation of that right should be narrowly construed.

■■ It is implicit in the Act that the public interest is served by freedom of labor to use the weapon of picketing; and that peaceful picketing by a labor organization in the course of a labor dispute is an activity subject to injunc-

tion only through the procedures authorized in the Act when it is reasonably cognizable as an unfair labor practice under the Act. See Aetna Freight Lines, Inc., v. Clayton, 2 Cir., 228 F.2d 384, 388. In the latter case, Chief Judge Clark said:

"The only strikes which are declared to be illegal are secondary boycotts and jurisdictional strikes. * * * In this context of labor controversy, the legality of peaceful picketing may not be decided on the common law of torts; rather the conflicting interests of the union, the employer, the workers, and the community must be weighed according to the statutory scheme."

Section 8(b) (4) (A) of the Act, 29 U.S.C.A. § 158(b) (4) (A), sets forth the following specific exception, in defining the term "unfair labor practice for a labor organization":

"(b) It shall be an unfair labor practice for a labor organization or its agents—

* * * * * *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *."

The question before me is whether the respondents' activities come within the protective coverage of section 13 or whether they come within the proscriptive exception of section 8(b) (4) (A).

■■ In ruling on this temporary injunction application, I emphasize the fact that I am not required to, nor do I, determine the ultimate merits of petitioner's charge that respondents have violated the Act. My decision determines only the preliminary issue of whether there is probable cause to believe that there has been an unfair labor practice, and that there is a reasonable probability that respondents' activities may be held to be illegal. Nothing that is said in this opinion is to be taken as an indication as to whether the strike is just or unjust, or whether the respondents' activities will have been found to be proper or improper after a full Board hearing. Shore, for and on Behalf of National Labor Relations Board v. Building & Const. Trades Council, 3 Cir., 1949, 173 F.2d 678, 682, 8 A.L.R.2d 731; Le Baron v. Kern County Farm Labor Union, D.C.S.D.Cal.1948, 80 F.Supp. 151, 157–158; Styles v. Local 760, International Brotherhood of Electrical Workers, D.C.E.D.Tenn.1948, 80 F.Supp. 119, 122; Douds v. Local 294, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, D.C.N.D.N.Y.1947, 75 F.Supp. 414.

■ It is also appropriate to point out that, when a Court of Appeals (as distinguished from a District Court) has before it a petition to enforce an order of the National Labor Relations Board, the inquiry is "whether on the record as a whole there is substantial evidence to support the order" and the findings of the Board. See N. L. R. B. v. Pyne Molding Corporation, 2 Cir., 226 F.2d 818, 819. Many of the reported cases are Court of Appeals' decisions, where the Court had before it the record of a full Board hearing and a petition for a permanent injunction to enforce the Board's order, issued after a plenary trial.

■■ Such cases are to be distinguished, initially, from situations in the District Court where the Board—as in the case at bar—seeks a preliminary injunction pending the hearing and determination by the Board. In such situations, the quantum of proof required of the Board is that it demonstrate "reasonable cause to believe" that respondent-unions have engaged in and will engage in unfair labor practices. As already stated, a decision on such a motion for provisional relief is not an adjudication of the merits of the controversy.

■ A union may lawfully inflict harm on a neutral employer, without violating section 8(b) (4), "so long as the harm is merely incidental to a traditionally lawful primary strike, conducted at the place where the primary employer does business." N. L. R. B. v. Service Trade Chauffeurs, etc., supra, 191 F.2d at page 67. It has been pointed out that, "where the primary employer's business, travelling about on wheels, rolls up to the secondary employer's door or onto his premises", it is lawful for a union to picket the primary employer there notwithstanding the fact that "the secondary employer might thereby be injured." N. L. R. B. v. Service Trade Chauffeurs, etc., supra, 191 F.2d at pages 67–68.

Where the business of the primary employer has "a roving situs" or where the business of the primary employer and the business of the secondary employer have "a common situs," the National Labor Relations Board and the courts have attempted to formulate "criteria" or "tests" for determining whether the picketing at the "roving situs" or "common situs" is legitimate. The Court of Appeals for this Circuit, in N. L. R. B. v. Service Trade Chauffeurs, etc., supra, 191 F.2d at page 68, regarded "as a sound interpretation of the Act the principles laid down in Sailors' Union of the Pacific [Moore Dry Dock Co.], 92 N.L.R.B. No. 93."

■ In the Moore Dry Dock case, the Board said (92 N.L.R.B. at page 549):

"In the kind of situation that exists in this case, we believe that picketing of the premises of a sec-

ondary employer is primary if it meets the following conditions: (a) The picketing is strictly limited to times when the *situs* of the dispute is located on the secondary employer's premises;

(b) at the time of the picketing the primary employer is engaged in its normal business at the situs; (c) the picketing is limited to places reasonably close to the location of the *situs*; and (d) the picketing discloses clearly that the dispute is with the primary employer."

It was a fact in the Moore Dry Dock case that the picketing union did not have available to it a separate situs for effective picketing, other than the common one. A consideration of the evidence in that case furnishes the necessary frame of reference for the Board's opinion. The dispute was between Samsoc, the owner of a vessel known as the SS Phopho, and the respondent-union over working conditions aboard that vessel. The vessel was the place of employment of the seamen, and hence was treated as the situs of the dispute between the owner of the vessel, as the primary employer, and the respondent-union. The owner of the vessel did not have a dock of its own in any port of the United States. The vessel, during the entire period of the picketing, was tied up at a dock in the Moore shipyard. The vessel had been delivered by the shipowner to the Moore shipyard for overhaul and repair; but during the last two weeks before the vessel's delivery by the shipyard to the shipowner, the latter used the dock for the purpose of readying the ship for its regular voyage by hiring and training a crew and by putting stores aboard the ship. At the time the picketing started, ninety per cent of the shipyard's work in overhauling and repairing the ship had been completed; virtually the entire crew had been hired; the ship's oil bunkers had been filled and other stores were shortly to be put aboard. The various members of the crew who had reported aboard the vessel were getting the ship ready for sea and were thus engaged in doing the normal business of the ship. Before placing its pickets outside of the entrance to the Moore shipyard, the respondent-union asked, but was refused, permission to place its pickets at the dock where the ship was tied up. The respondent-union, therefore, posted its pickets at the yard entrance, which was as close to the vessel as they could get. In its picketing, the respondent-union indicated that its dispute was solely with the primary employer. Finally, the shipyard's (the secondary employer's) own witnesses admitted "that no attempt was made to interfere with other work in progress in the Moore yard" (at p. 551).

The Board viewed the situs of the dispute with the primary employer as "ambulatory" and as resting or stationed temporarily at the premises of the secondary employer, the Moore shipyard; and the Board found that "the only way to picket that *situs* is in front of the secondary employer's premises" (at p. 549). The Board regarded the Moore shipyard, the secondary employer, as "harboring the situs of a dispute between a union and a primary employer" (at p. 549) and concluded that the picketing at "the premises of a secondary employer" in that case was nevertheless "primary."

In contradistinction to the facts in the Moore Dry Dock case, there is evidence in the case at bar that the primary situs of the dispute between Cache and Distributors, the primary employers, was in Utah; that the respondent-Utah unions were able to picket the primary situs of the dispute in Utah, where most of the primary employers' employees worked; that the Utah unions did not limit their activities in front of the secondary employer's (Dorman's) premises to merely picketing the products of the primary employers, but requested the employees of the secondary employer to aid the Utah unions by refusing to handle the products of the primary employers.

It is also illuminating to contrast the facts in the case at bar with those involved in N. L. R. B. v. Business Machine and Office Appliance Mechanics Conference Board, Local 459, etc. [Royal Typewriter Company] 2 Cir., 228 F. 2d 553, in which the Court of Appeals for the Second Circuit denied enforcement of an N. L. R. B. petition, where the issue was whether the union's picketing and related conduct constituted a secondary boycott in violation of section 8(b) (4) (A). In that case, the primary employer was Royal Typewriter Company. When its typewriter mechanics and other service personnel went out on strike, Royal, in effect farmed out some of its services and repair work to four independent typewriter repair companies, thus enabling Royal to discharge its contract obligations to its customers. This was done when the office personnel of Royal told its contract customers to select some independent repair company, to have the repair made, and to send a receipted invoice to Royal for reimbursement. The peaceful and orderly picketing of such independent typewriter repair companies—which was unaccompanied by any strike or refusal to work by any employee of such companies, with the exception of one employee who did not want to cross a picket line—was held to be legitimate. The Court of Appeals approved the "ally" doctrine enunciated by Judge Rifkind in the Ebasco case (Douds v. Metropolitan Federation of Architects, Engineers, Chemists & Technicians, Local 231) D.C.S.D.N.Y. 1948, 75 F.Supp. 672, and regarded the independent repair companies as so closely allied with Royal as to put them in the position of doing the farmed-out work of Royal as a method of breaking the impact of the strike.

The second aspect of the Royal case was that concerned with the picketing of Royal's customers. The picketing was peaceful and orderly; it took place before entrances commonly used by members of the public, by employees of the picketed firm and by others, and not at entrances used exclusively by employees;

one of the 37 picketed customers did discontinue doing business with Royal, but there was no evidence to indicate that this came about through any pressure on or from any of such customer's employees; there was no evidence that any employees of the customers engaged in a strike or refusal to work; and the Court of Appeals specifically pointed out that the Trial Examiner had not made a finding that it was an object of the Union to influence employees; that neither had the Board made any additional finding in this respect; and that, therefore, the situation was one "where the Board found neither an attempt to affect employees nor any actual effect upon them from which the attempt could be inferred. * * * It was not shown that the picketing had any tendency to induce the employees to strike or cease performing services." [228 F.2d 559.] The Court of Appeals found "neither intent to induce, nor effective inducement, nor even probable inducement of employees." Thus, the Court of Appeals concluded that one of the essential elements of an illegal secondary boycott under section 8(b) (4) (A) was lacking.

In the case at bar, all of the essential elements are present, including the following, which were absent in the Royal Typewriter case: the Utah unions requested the employees of the secondary employer to refuse to handle the products of the primary employer; the employees of the secondary employer refused to handle the products of the primary employer; and the Utah unions induced and encouraged the secondary employees to refuse to handle the products of the primary employer, with the object of forcing the secondary employer to cease doing business with the primary employer.

It is also pertinent to observe that every truck that came to the secondary employer in New York had been loaded at the Utah plant; and that, at that point in Utah, there were pickets. There is probable cause to believe that the only reason why the Utah unions sent pickets to New York was not to appeal

to that Utah truck driver—to whom they had already appealed in Utah when he loaded the cheese on the truck—but to induce and encourage the secondary employees not to handle the products of the primary employers. This cannot realistically be said to be only "incidental" to the lawful picketing in Utah.

A note of warning—that there is "no rigid rule"—was recently sounded by the Court of Appeals for The District of Columbia Circuit, in Sales Drivers, Helpers & Building Construction Drivers, Local Union 859, etc., AFL v. N. L. R. B. [Campbell Coal Company], 229 F. 2d 514. In that case, the Court refused to enforce a Board order. The Board had found that the union had violated section 8(b) (4) (A), by picketing at a site common to the primary and secondary employers in view of the fact—which the Board considered as decisive—that the union had available for effective picketing sites of the primary employer other than the common one. In that case, the primary employer ("Campbell") was engaged in the sale of building materials, including ready-mixed concrete. It operated two ready-mixed concrete plants, where it employed, among others, men who drove trucks by which Campbell delivered the ready-mixed concrete to the construction sites. At the delivery points, the truck drivers, at the direction of the contractors (the secondary or neutral employers) on those sites, operated the unloading mechanism of the truck so as to place the ready-mix at places and in receptacles provided by the contractors. The drivers spent approximately twenty-five per cent of their working time at the Campbell plants; twenty-five per cent en route, and fifty per cent at the construction or common sites.

A number of the truck drivers were discharged by Campbell; and this resulted in a strike. The union picketed two ready-mix plants. In addition, the pickets went to the various construction projects where the trucks made deliveries and continued picketing at the construction sites. The signs carried by the pickets clearly indicated that the picketing was not directed against the secondary employers. The picketing continued so long as Campbell's trucks remained on the construction site. The picketing was confined to the immediate area of the trucks or as close as the pickets could get without trespassing on private property.

The Court pointedly observed [229 F. 2d 515]:

"Except for displaying the picket signs, the Union's pickets did not communicate with any employees working at the projects."

The Court said that the Board had erroneously held that the picketing was illegal "solely" because the union had available for effective picketing the sites (Campbell's own two plants) other than the common situs shared with the neutral employers; and that the Board had erroneously applied "a rigid rule" that picketing at a common situs is conclusively prohibited when separate sites are available.

The Court footnoted (its note "4") that the accessibility or availability of another site for effective picketing was not the only factor considered by the Board in another of its decisions recently upheld in N. L. R. B. v. Associated Musicians of Greater New York, Local 802, 2 Cir., 226 F.2d 900. "In that case requests were made by Union representatives that the secondary employers cease doing business with the primary employer. This was true in the present case, but was not relied upon by the Board." The Court also footnoted (its note "2") that "pickets did not speak to or communicate with any [secondary] employees on the projects other than by displaying the picket signs, * * * or offer any other form of inducement or encouragement so to do [i. e., to quit work]."

The Court rejected the Board's argument "that when another such separate situs is available picketing at a common situs is prohibited." The Court specifically noted that the primary employ-

ers' employees "spent 50 per cent" of their time with the trucks at places where the primary employer did business coincidentally with neutral employers, in contrast to 25 per cent spent at the primary employers' place of business.

The Board had taken the position that it was an "absolute prerequisite" and a "condition" that the picketing union should not have available to it a separate situs for effective picketing, other than the common one. It was this "rigid rule" laid down by the Board that was disaffirmed by the Court.

In Thurston Motor Lines, Inc., 110 N.L.R.B. No. 122 [page 748], the Board held (at p. 754) that picketing at a common situs was unlawful "when the employer has a primary place of business in the locality which can be picketed by the labor organization with which the employer has a dispute." In the Thurston case, there was a separate situs; and the Board concluded that the picketing at the situs which was common to the struck employer and the secondary employer was not primary, but was an improper secondary boycott.

In Washington Coca-Cola, 107 N.L.R. B. No. 104, page 299, the Board held that the Moore Dry Dock rule was inapplicable whenever the struck employer has a permanent place of business at which picketing can be effectively carried on. The Washington Coca-Cola case was affirmed sub nom. Brewery and Beverage Drivers and Workers Local Union No. 67 v. N. L. R. B., 1955, 95 U.S.App. D.C. 117, 220 F.2d 380. But the Court of Appeals for the District of Columbia has now pointed out that, in affirming the Washington Coca-Cola case, it merely agreed with the conclusion reached by the Board.

The essential point made by the Court in the Campbell Coal Co. case, supra, is contained in the following portion of the Court's opinion:

"The existence of a common site, of such incidental effect [on secondary employees], and of another place [other than the common situs]

which can be picketed, are factors to be considered in determining whether or not the section [8(b) (4) (A)] has been violated, but alone are not conclusive. The presence of these factors does not warrant a failure to consider other facts which are relevant and perhaps countervailing. See N. L. R. B. v. General Drivers, Warehousemen and Helpers, Local 968, 5 Cir., 225 F.2d [205] at pages 209–210. No rigid rule which would make these few factors conclusive is contained in or deducible from the statute."

The analysis suggested above has been adopted in evaluating the record in the case at bar. There is no one single controlling or decisive fact which, per se, would convert a protected secondary activity into an illegal secondary boycott. All of the factors have been considered in determining whether or not there is reasonable cause to believe that the Act has been violated. Such was the analysis used by the Court of Appeals for the Second Circuit in N. L. R. B. v. Associated Musicians of Greater New York, Local 802, 2 Cir., 226 F.2d 900.

In the formulation of my discretion, I have given appropriate consideration to the various factors that, either alone or in combination with others, have been treated by the courts as legitimatizing secondary activities. For example, I have considered the fact that the transporting of the primary employers' products is done by trucks and that, in that special sense, the business may be said to have a roving or ambulatory situs. On the other hand, the manufacturing and processing of the cheese and related products takes place in the factory of the primary employers in Utah, at a fixed location, where the great majority of their employees work. So far as the truck drivers are concerned, the greatest amount of their time of actual employment is spent on the road traveling, with relatively minor portions of their hours of employment devoted to loading and unloading.

In support of their claim that their picketing was a "protected activity," the respondents advert to the fact that their pickets patrolled about the truck belonging to Distributors only during the time that the particular truck was at the premises of the secondary employer and was engaged in the usual business of the primary employers of transporting and selling the products of the primary employers. In the case at bar the problem —referred to in other cases as "common situs" picketing—is rendered less difficult of solution because of the presence herein of the additional features of direct inducement and encouragement of the secondary employees to engage in a concerted refusal to handle the products of the primary employers.

The respondents do not place controlling importance upon the alleged inaccessibility of the situs of the primary employers to effective picketing. Nevertheless, the respondents have introduced evidence which, they claim, is suggestive of the fact that the premises of the primary employers were in fact inaccessible for purposes of effective picketing. Thus, it is the stipulated testimony in behalf of respondents that their pickets could not get closer than a city block to the primary employers' factory; that the factory is two or three miles outside of the city limits of Smithfield, Utah; and that the union offices of the respondents are located in Salt Lake City and Ogden, which are 90 and 50 miles distant from the factory.

 I do not believe that the evidence makes out a case of inaccessibility. Moreover, the picketing in Utah received nationwide publicity and has resulted in the cessation of the trucking services to the primary employers of the four major western common carrier truck lines.

 In this case there is something more than, and different from, mere sympathetic response or natural reaction by fellow-union members to the existence of the respondents' picket line. The evidence in this record furnishes a substantial basis for finding that the respondents induced and encouraged the secondary employees to engage in a concerted refusal to handle the goods of the primary employers. The inducement was accomplished by affirmative acts and conduct over and beyond the mere picketing. The parties stipulated that, if the Board called witnesses, they would testify that the respondents requested the secondary employees not to handle the products of the primary employer (Transcript of Hearing on November 2, 1955, pp. 27, 28, 30). Other evidence in the case supports the inference that the New York City union was acting in concert with the respondents with the objective of getting the secondary employer to stop doing business with the primary employer. (This took the form of a joint request made at a meeting in New York City, attended by top officials of the three unions together with the secondary employer, at which time the latter was told not to deal with the primary employer in order to aid the Utah unions. This meeting took place before the picketing began.) On July 26, 1955 the pickets appeared; and the secondary employees refused to unload the cheese from the primary employers' truck (Transcript of Hearing on November 2, 1955, p. 62). This refusal to work and to handle the product of the primary employers must be viewed against the background of and in context with the other events, viz. the request of the respondents to the secondary employees and the joint request of the three unions to the secondary employer. The joint request to the secondary employer had been made prior to the picketing, while the request to the secondary employees was made on the day of the picketing (Transcript of Hearing on November 2, 1955, pp. 27, 28, 30, 60).

The picketing continued on July 27, 1955. Again, the respondents requested the secondary employees not to handle the primary employers' products; but the truck was unloaded by a secondary employee named Nigro (Transcript of

Hearing on November 2, 1955, pp. 27, 28, 30, 60, 62).

On July 28, the president of Local 277 told Nigro that he should not have unloaded the primary employers' truck the day before, and that he could have been brought up on charges (Transcript of Hearing on December 14, 1955, p. 105). No picketing took place on that day (Transcript of Hearing on November 2, 1955, p. 19).

In the early part of August 1955, the secondary employees refused to unload the products of the primary employers that were brought to the premises of the secondary employer by Mid-State Trucking Company (Transcript of Hearing on December 14, 1955, p. 104). There was no picketing that day.

On or about September 1, 1955, the president of Local 277 told the secondary employees not to unload trucks of the primary employers if such trucks should come in that day (Transcript of Hearing on December 14, 1955, pp. 104–105). There was no picketing that day.

On October 31, 1955—six days after Local 277 had signed the "cease and desist" stipulation—picketing was resumed by the respondents and the latter requested the secondary employees not to handle the primary employers' products, but the truck was unloaded and delivery was effected (Transcript of Hearing on November 2, 1955, pp. 27, 28, 30, 60, 62).

▆▆▆ Standing alone, the pre-picketing request made jointly by the three unions directly to the secondary employer to stop dealing with the primary employers, does not violate the Act, even if it be considered as an implied threat; nor does the Board dispute its legality. N. L. R. B. v. Business Machine and Office Appliance Mechanics Conference Board, Local 459, etc. [Royal Typewriter Company], 2 Cir., 228 F.2d 553, citing Rabouin v. N. L. R. B., 2 Cir., 1952, 195 F.2d 906, 911–912, and N. L. R. B. v. Associated Musicians of Greater New York, Local 802, 2 Cir., 226 F.2d 900.

▆▆▆ But a sharp distinction must be drawn between the legality of that joint request—if it were considered as an ultimate fact *per se*—and its probative value—if it be considered as an evidentiary fact. In the latter case, it may be regarded as furnishing some basis for the logical inference that the Utah unions had enlisted the aid of their New York City sister union in a common endeavor, the objective of which was to use the stoppage of the secondary employer's business with the primary employers as pressure upon the latter to accede to the demands of the Utah unions. Proof of that joint request is admissible as an item of circumstantial evidence, to be considered along with all the other evidence in the case (such as the Utah unions' request to the secondary employees not to handle the products of the primary employers) in determining the essential nature, motivation and intent, and the objectives of the respondents' conduct. See N. L. R. B. v. Associated Musicians of Greater New York, Local 802, 2 Cir., 226 F.2d 900; N. L. R. B. v. Denver Bldg. & Const. Trades Council, 10 Cir., 1952, 193 F.2d 421, 423–424.

Respondents' counsel characterizes the injunction imposed on the New York City union by its stipulation as "self-imposed restraint" and as "self-imposed handcuffing of Local 277 from concerted reaction to an overt or implied request on the part of the respondents to react favorably to the picket sign or line by refusing to handle the goods." The Utah unions disclaim any responsibility for Local 277's entering into the stipulation; and they point to the qualification contained in paragraph "10" of the stipulation that "the signing of this stipulation by the respondent union [277] does not constitute an admission that it has violated the Act." Moreover, they argue that the exposure of Local 277 to the judicial sanctions of civil and possibly criminal contempt (see N. L. R. B. v. Warren Company, Inc., 350 U.S. 107, 76 S.Ct. 185; N. L. R. B.

v. International Hod Carriers', etc., Local 210, AFL, 2 Cir., 228 F.2d 589) constitute a practical guaranty that the conduct proscribed by the Act will not take place, but that if such conduct should occur there are summary remedies; i. e., contempt proceedings, available to the Board to enforce the consent cease and desist injunction.

These arguments are an incorrect and oversimplified interpretation of the "cease and desist" stipulation, and of the applicable construction of the Act. It is now well-settled that the words "induce or encourage" used in section 8(b) (4) (A) do not refer only to a successful inducement and encouragement; success was not intended by the legislators to be an essential element of a violation of that section. N. L. R. B. v. Associated Musicians of Greater New York, Local 802, etc., AFL, 2 Cir., 226 F.2d 900; N. L. R. B. v. Denver Bldg. & Const. Trades Council, 10 Cir., 1952, 193 F.2d 421. Therefore, the fact *arguendo* that, in the future, there may be a decreased likelihood that the inducement and encouragement by the Utah unions will succeed is immaterial and irrelevant.

Furthermore, the Local 277 stipulation binds only that union as a union; and, significantly, that stipulation does not place Local 277 under a positive duty to order its members who work for the secondary employer (Dorman) to handle the products of the primary employers. All that the stipulation means is that Local 277 will not, by a positive act, induce its members not to handle the products of the primary employers.

It must be borne in mind that that stipulation does not prevent the Utah unions from inducing or encouraging or continuing to induce and encourage the employees of the secondary employer to engage in a concerted refusal to handle the products of the primary employers, with the objective described in section 8(b) (4) (A).

There is no merit to the respondents' two-pronged argument that they cannot induce and encourage the employees of the secondary employer to engage in a concerted refusal because (as respondents argue) first, the prohibited inducement and encouragement must be made to the entity known as Local 277 (as distinguished from the members of that union who work for the secondary employer); and, secondly, Local 277 cannot be induced and encouraged, in view of the fact that it would be exposed to contempt proceedings if it, in turn, were to induce its members who work for the secondary employer not to handle the products of the primary employers.

It is, therefore, my conclusion that there is reasonable cause to believe that respondents herein have violated section 8(b) (4) (A) and that, accordingly, the Board's petition for an interlocutory injunction should be, and hereby is, granted.

Settle order on notice.