## NATIONAL LABOR RELATIONS BOARD v. DENVER BLDG. & CONST. TRADES COUNCIL et al.

### No. 4171.

United States Court of Appeals
Tenth Circuit.

Jan. 4, 1952.

Pickett, Circuit Judge, dissented.

Bernard Dunau, Washington, D. C. (George J. Bott, David P. Findling, A. Norman Somers, Fannie M. Boyls, and Julius G. Serot, all of Washington, D. C., on the brief), for petitioner.

Philip Hornbein, Jr., Denver, Colo. (Philip Hornbein, Denver, Colo., on the brief), for respondents.

Before BRATTON, HUXMAN and PICKETT, Circuit Judges.

HUXMAN, Circuit Judge.

This is a conventional proceeding in which the Board seeks enforcement of its order against Denver Building and Construction Trades Council, herein called the "Council" and International Brotherhood of Electrical Workers, A. F. L., Local 68, herein called the "Electricians," ordering them to cease violations of Section 8(b) (4) (A) of the National Labor Relations Act, 29 U.S.C.A. § 151 [1] et seq., and to post appropriate notices.

The facts upon which the decision turns are substantially these: The Council is a labor organization, composed of representatives of various local unions, whose members are engaged in building and construction work, in Denver and its vicinity. The Electricians, an affiliate of the American Federation of Labor, is a labor organization, composed of craftsmen whose work falls within its craft jurisdiction. It is a component part of the Council.

Grauman Company is a corporation engaged in the manufacture, sale and sometimes partial installation of soda fountains and fixtures for stores and restaurants. Quigley, a restaurateur, entered into a lease contract with W. D. Moore, Manager of a suburban drug store in Aurora, a suburb of Denver, Colorado, under which Quigley was to operate as an independent concessionaire the restaurant, bakery, soda fountain and ice cream departments in the drug store. Quigley was to supply and in-

1. "Sec. 8
"(b) It shall be an unfair labor practice for a labor organization or its agents—
"(4) To engage in, or to induce or encourage the employees of any employer to engage in, a strike or a ·concerted refusal in the course of their employment to * * * handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any * * * producer, processor, or manufacturer, or to cease doing business with any other person * * *."

stall the equipment necessary to operate his concession. He contracted with Grauman for the purchase and partial installation of the soda fountain and other equipment to be installed in his concession. Under the contract Grauman was to sell and affix the equipment to Quigley's premises, but Quigley was to make his arrangements for the installation of the plumbing and electrical installations. Accordingly, he entered into contracts with Acme to do the electrical work and with McCarty to do the plumbing work. Grauman operated a non-union shop. Acme and McCarty were unionized. Because of his non-union operations, Grauman had been placed on the Council's unfair list.

Grauman delivered the fixtures and equipment to the Quigley job at the drug store on or about July 18, 1948. Soon after delivery, the Acme and McCarty employees began to make the plumbing and electrical installations necessary to put the fountain in operation. On July 20, 1948, only a few days after the equipment had been delivered and work commenced thereon, Clifford Goold, the Council's secretary-treasurer and business representative, appeared at the store. Two McCarty plumbers, William Fleming and his helper, John Jacks, were already at work, installing the Grauman fountain for Quigley. Both were members of the Plumbers Union. Goold met Moore, the store manager, and remarked that Moore had a nice store and that it was a shame that they were going to have to put a picket on his place. Moore asked why and Goold replied it was because Grauman was unfair. While Moore was called away to the telephone, Goold walked over to the two plumbers who were working on the fountain. He asked Fleming whether he knew that Grauman was on the Council's unfair list. Fleming was surprised at this statement, but pointed out that there were no Grauman employees present and asked whether that made any difference. Goold replied, "Admittedly, nothing makes any difference." Moore, returning from his telephone call, found Goold talking with the plumbers about whether the job was "unfair or not fair" and heard him tell the plumbers that re-

gardless the job was unfair, because Grauman was unfair and it was a Grauman fountain. The following morning Goold returned to the store, this time accompanied by J. R. Fisher, assistant business agent of the Electricians. Again they asked Quigley whether he knew that Grauman was a non-union shop. Quigley replied that he had not known it and asked, "What do you want me to do about it?" Goold or Fisher told him they wanted him to go down to Grauman and try to get them organized, get them to join the union. Quigley replied that "It was not my job to do that."

Phil Oaks and his helper, the Acme electricians assigned to the Quigley job, had already begun making the necessary electrical connections to the fountain. Both Oaks and his helper were members of the Electricians. When Quigley refused to comply with respondents' demand that he help unionize Grauman, Goold and Fisher immediately walked over to Oaks. They asked him how long it would take to complete the Quigley installation. He replied that he expected to finish the work on the fountain in about forty minutes, whereupon Fisher stated: "Well, I can't order you off the job but you know what you better do about it."

The minutes of the meeting held by the Council the following week, over which Goold presided, showed that prior to Goold's visit to the store, he had been instructed to place a picket line at the store, because of the Council's dispute with Grauman. According to the minutes, Goold reported to the meeting that "After contacting Mr. Moore, manager of the store, [Goold] felt that we would be defeating our objective by placing a picket on this job." The day after Goold and Fisher visited the store, Grauman filed with the Board the unfair labor practice charges which, as subsequently amended, resulted in these present proceedings.

The Board found that the union officials' objective was to further the Council's dispute with Grauman by bringing pressure upon Quigley. While the Board found this was not illegal in itself, it concluded that it did reveal the motives of respond-

ents' representatives in speaking to Oaks and Fleming. This finding is supported by the conversation Goold and Fisher had with Quigley in which they told him that he could avoid a picket line by "going down to Grauman and trying to get them to join the union."

Section 8(b) (4) (A) of the Act makes it an unlawful labor practice for a labor organization to induce or encourage the employees of a neutral employer to engage in a strike or refuse to work, in order to force such employer to cease doing business with one with whom the organization has a dispute and thereby force him to accede to the organization's demand.

The Board's finding of a violation of Section 8(b) (4) (A) is based solely on the conversation Goold had with McCarty's plumbers, Fleming and his helper, Jacks, in which Fleming pointed out that no Grauman employees were present and, when asked whether that made any difference, replied: "Nothing makes any difference," and that "Regardless the job was unfair because Grauman was unfair and it was a Grauman fountain" and on the conversation Goold and Fisher had with Oaks and his helper, Acme electricians assigned to the Quigley job, in which when he was told that it would take only forty minutes to finish the job, Fisher replied: "Well, I can't order you off the job, but you know what you had better do about it." These statements tend to support the Boards' finding that the Council and Electricians induced or encouraged concerted conduct by the employees of Acme and McCarty, neutral employers, to cease doing business with Grauman.

On June 4, 1951, the Supreme Court decided a series of cases involving Section 8(b) (4) (A) of the Act.[2] All these decisions make it clear that it is not necessary to a violation of this section that labor organizations engage in a secondary strike or persuade other employees to do so. It is sufficient if they *induce or encourage concerted*[3] conduct by the employees of a neutral employer to engage in such a strike, although they may fail in their efforts. In the Denver Building Council, Electrical Workers, and Carpenters Union cases, the Supreme Court upheld the Board's findings that there was encouragement and inducement within the prohibition of the Act. In the International Rice Milling Company case, upon which respondents rely, the Supreme Court upheld a finding by the Board that there was no violation of the Act and reversed the appellate court, which had set aside the Board's dismissal of the complaint. This conclusion by the Supreme Court was predicated upon the fact that the inducement and encouragement not to cross a picket line at the place of a primary strike was addressed to but one truck driver of a neutral employer and that, therefore, there was an absence of any effort to bring about *concerted* conduct by the employees of a neutral employer, an essential ingredient of the prohibited conduct under this Section of the Act.

While this is not an aggravated case nor is the evidence overwhelming, we think it is sufficient to sustain the findings of the Board and its order will, therefore, be enforced.

PICKETT, Circuit Judge (dissenting).

I cannot agree that the record in this case meets the substantial evidence test as required by the Taft-Hartley Act. In Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456, it was stated that under the Act Courts of Appeal must assume more responsibility for the reasonableness and the fairness of Labor Board decisions than they had in the past. It was said that this "responsi-

2. National Labor Relations Board v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277; National Labor Relations Board v. Denver Building & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299; and Local 74, United Brotherhood of Carpenters and Joiners of America v. National Labor Relations Board, 341 U. S. 707, 71 S.Ct. 966, 95 L.Ed. 1309.

3. Emphasis supplied.

bility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, * * *. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony * * *." The evidence of unfair labor practices on the part of the respondents to say the most is extremely meager. The respondents did not engage in a strike and the Board found that the activities of their representatives were not responsible for any strike or work stoppage. Considering the evidence most favorable to the Board, no more was done than to suggest that a plumber and an electrician refuse to complete the installation of equipment which was manufactured in a non-union shop.

The purpose of Sec. 8(b) (4) (A) of the Act is to outlaw concerted work stoppages against neutral parties. Here there were no strikes or concerted work stoppages as a result of the activities of the respondents and according to my view of the evidence none was advocated. I think the facts are clearly within the rule of N. L. R. B. v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277. See also, N. L. R. B. v. Service Trade Chauffeurs, Salesmen & Helpers, Local 145, 2 Cir., 191 F.2d 65.

I would deny the order of enforcement