**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ASSOCIATED MUSICIANS OF GREATER NEW YORK, LOCAL 802, AMERICAN FEDERATION OF MUSICIANS, AFL, and Al Manuti, its agent, Respondents.**

No. 35, Docket 23550.

United States Court of Appeals Second Circuit.

Argued Oct. 5, 1955.

Decided Nov. 3, 1955.

Samuel M. Singer, Atty., N. L. R. B., Washington, D. C. (Theophil C. Kammholz, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and William J. Avrutis, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

David I. Ashe, New York City (Ashe & Rifkin, New York City, on the brief), for respondents.

Before CLARK, Chief Judge, and MEDINA and LUMBARD, Circuit Judges.

CLARK, Chief Judge.

This is a petition by the National Labor Relations Board for enforcement of its order directing respondent musicians' union and its president and agent, Manuti, to desist from certain unfair labor practices. The Board found that respondents had violated § 8(b)(4)(A) of the Act, 29 U.S.C. § 158(b)(4)(A), by inducing and encouraging employees of New York Yankees, the Parkway Sporting Club, Inc., and various employers doing business with the Yankees and Parkway to engage in strikes, an object of which was to force or require these employers to cease doing business with Gotham Broadcasting Corporation.

The basic facts, as found by the Board on report of its trial examiner, 110 N.L.R.B. No. 269, are not seriously in dispute. We summarize them as follows: Gotham Broadcasting Corporation owns and operates Radio Broadcasting Station WINS, with offices and studios located at 28 West 44th Street in New York City. The transmitter of WINS, which is connected by telephone circuit to the studio, is located in Lyndhurst, New Jersey. WINS broadcasts, at a power of 50,000 watts, commercial and sustaining programs to audiences in New York and surrounding states and also furnishes programs which are broadcast from radio stations in other states. During 1953 Station WINS, then owned by Gotham's predecessor, Crosley Broadcasting Corporation, furnished services valued at more than $900,000 to various enterprises, approximately half of which were engaged in interstate commerce.

The musicians employed by WINS were represented by the union, respondent in this case. On April 1, 1954, as a result of a dispute over the number of musicians to be employed by Gotham at the radio studio, the union went on strike and commenced to picket at the studio.

WINS carries the broadcast descriptions of baseball games played by the New York Yankees at Yankee Stadium. The broadcasting rights to Yankee games are owned by River Operating Corporation, which furnishes its own announcers for broadcasts of the games and which purchases time from Gotham for the broadcasts. Game broadcasts are made from Yankee Stadium, where they are relayed by telephone circuit to the WINS studio and thence to the transmitter in New Jersey. In connection with the broadcasts from Yankee Stadium, Gotham provides a portable amplifier, portable microphones, and one engineer (not a member of respondent union) who goes to the Stadium the morning before the broadcast and remains until after its completion. Gotham derives about ten per cent of its revenue from the Yankee Stadium broadcasts and an additional ten per cent from pre- and post-game broadcasts made from the studio.

The American League franchise for the New York Yankees is owned by a partnership which leases the Yankee Stadium, and which also employs the players and certain other clerical and promotional employees who work there. The partnership has a contract with River Operating Company, Inc., whereby River operates and manages the Stadium. River, in turn, employs a superintendent, ticket sellers, clerks, and others who work at the Stadium. River also has a contract with Allied Maintenance Cor-

poration, whose employees perform various service functions connected with the baseball games and who work at the Stadium. There are, in addition, two other concessionaires who furnish refreshments, and whose employees work at the Stadium. On game days, employees of various news disseminating agencies, such as radio, television, telegraph, and newspapers, are employed at the Stadium. The musicians employed by Gotham did not, however, work there.

On April 1, 1954, when the strike against Gotham began, respondent union sent a telegram to one of the co-owners of the Yankees requesting that he use his "good offices and influence" in effecting a settlement between the union and Station WINS. On April 10, 1954, the union began to picket Yankee Stadium around its entire perimeter, with the result that picketing covered employee and delivery, as well as public, entrances. Picketing continued on game days until May 24 and was enjoined on May 27, 1954. Douds v. Associated Musicians of Greater New York, Local 802, D.C.S.D. N.Y., 123 F.Supp. 798. The picketing commenced each day after a majority of the employees of the concessionaires and other employers had entered the Stadium and coincided with the opening of the gates to the general public.

The regular baseball season was scheduled to begin on April 15, 1954, with traditional ceremonies, including the playing of the National Anthem by the Seventh Regiment Band, whose members belong to the respondent union. The Band is under the direction of Francis W. Sutherland, a retired Army Major, who books its engagements, employs and pays its musicians, and leads its playing. On April 13 and 14, 1955, there were two telephone conversations between respondent Manuti and Major Sutherland regarding the possibility of picketing at Yankee Stadium on April 15. Sutherland stated that as a union member he could not cross the picket line. On the appointed day, the Band assembled at the Seventh Regiment Armory in preparation for its engage-

ment at Yankee Stadium. But when it failed to receive word of a strike settlement by 10:45 a. m., Major Sutherland dismissed it and it did not play at the ceremonies.

Between April 12 and April 14, Edwin B. Fisher, Director of Promotion of the Yankees, had three telephone conversations with respondent Manuti, during which Fisher attempted to persuade Manuti to allow the Band to play. Fisher offered to have the Gotham microphone removed from the Stadium while it was playing if this action would make the engagement acceptable to the union. Manuti, however, indicated that such a removal would not be sufficient and suggested instead that the Yankee management use its influence to have Gotham reach a settlement. He made it clear that without such a settlement the Band would not be permitted to play.

Gotham Broadcasting Corporation (Station WINS) was also under contract with the Parkway Sporting Club, Inc., operating the Eastern Parkway Rink in Brooklyn, New York, to broadcast accounts of boxing exhibitions given at the Rink each Monday night. In connection with these broadcasts Gotham provides at the Rink a portable amplifier, portable microphones, an engineer, and sportscasters. Parkway also leases food, refreshment, and other concessions at the Rink to various firms, whose employees work there. But no musicians from WINS are there employed.

Between 6:00 and 7:00 p. m. on April 12, 1954, respondent union began to picket at the Rink in front of the main entrance, which is used by most of the employees of Parkway and of the concessionaires operating inside the Rink, as well as by patrons. On the evening of April 12 during the time that respondent union was engaged in picketing, some of the employees of Parkway and of the concessionaires were arriving for work.

Shortly after commencement of the picketing it came to the attention of certain members of the management of Parkway, who immediately communicat-

ed by telephone with officials of the union. Upon being informed that the reason for the picketing was that fight broadcasts were going out over Gotham facilities, the Parkway management agreed to submit a letter promising to prevent Gotham from broadcasting and to order the removal of its equipment from the Rink until the settlement of the dispute between Gotham and the union. After delivery of the letter to a representative of the union the pickets were withdrawn before 8:00 p. m. No further broadcasts were made from the Rink until May 31, 1954, or after the injunction against picketing by respondent union had issued.

The picket signs at both the Yankee Stadium and the Rink read: "Musicians of Radio Station WINS Are on Strike, Local 802, American Federation of Musicians, Affiliated with the American Federation of Labor." The picketing at both locations was peaceful. None of the employees at either location actually engaged in a strike as a result of the picketing.

■ There is substantial evidence on the record considered as a whole to support the finding of the Board that an object of the picketing was to bring about a strike or concerted refusal to work on the part of employees at Yankee Stadium and at the Eastern Parkway Rink; we therefore accept it. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The union makes the claim that the only purpose of the picketing was to publicize its dispute with Gotham. But the evidence shows that at least one of its objectives was to apply pressure to the secondary employers for the purpose of causing them, in turn, to threaten Gotham with loss of business unless it came to terms with the union. The urgings to the Yankee management to "talk sense into their [the Gotham management's] heads" and to "use their good offices" clearly indicate the purpose of the picketing at the Stadium. At the Rink the fact that picketing immediately ceased when Parkway promised to keep Gotham

off the premises makes the purposes of that picketing quite clear. Requests and threats addressed by respondents to employers, even though not illegal in themselves, Rabouin v. N. L. R. B., 2 Cir., 195 F.2d 906, 911–912, may be considered in determining the motives for picketing. N. L. R. B. v. Denver Bldg. & Const. Trades Council, 10 Cir., 193 F.2d 421, 423–424.

It is true that the Stadium picketing began each day at the time when the gates were being opened to the public and after most, but not all, employees had reported for work. Picketing, however, covered all entrances, not merely the public entrances; and there was no indication from the signs carried by the pickets that employees were not being encouraged to strike. At the Rink picketing took place while employees were arriving for work. Thus there is substantial evidence that at both locations respondents' actions constituted inducement and encouragement to strike. "The reluctance of workers to cross a picket line is notorious." Printing Specialties and Paper Converters Union, Local 388, A. F. L. v. Le Baron, 9 Cir., 171 F.2d 331, 334. See also Piezonki v. N. L. R. B., 4 Cir., 219 F.2d 879; Teller, Picketing and Free Speech, 56 Harv.L. Rev. 180, 200–208.

■ Respondents argue that, since no employees of the secondary employers in fact engaged in a strike, there has been no violation of § 8(b)(4)(A) of the Act. They contend that the words "induce or encourage" used in that section refer only to a successful inducement and encouragement; where no actual strike or concerted refusal to work ensues, no violation can be found. This view, however, is supported neither by common understanding of the meaning of these words nor by authority. N. L. R. B. v. Denver Bldg. & Const. Trades Council, supra, 10 Cir., 193 F.2d 421. See also International Brotherhood of Electrical Workers, Local 501, A. F. of L. v. N. L. R. B., 341 U.S. 694, 702, note 7, 71 S.Ct. 954, 95 L.Ed. 1299. The legislative history of the Act also indicates that suc-

cess was not intended to be an essential element of a violation of § 8(b)(4)(A). Thus the report of the Senate Labor Committee, where the bill originated, stated: "Under paragraph (A) strikes or boycotts, or *attempts* to induce or encourage such action, are made violations of the act if the purpose is * * *." Sen.Rep. No. 105, 80th Cong., 1st Sess. 22–23, in 1 Leg.Hist. of the Labor Management Rel. Act 428; emphasis added. The actual language of the bill commented on by this report was "to engage in, or to induce or encourage the employees of any employer to engage in," a strike for specified purposes. This language is identical with that of the Act as finally enacted. Commenting on identical language of the bill, the House Conference Committee said: "Under clause (A) strikes or boycotts, or *attempts* to induce or encourage such action, were made unfair labor practices if the purpose was * * *." H.Conf. Rep. No. 510, 80th Cong., 1st Sess. 43, in 1 Leg.Hist. of the Labor Management Rel. Act 547; emphasis added. Hence it is clear that no employee of the secondary employer need actually engage in a strike in order that a violation of the Act be found.

The case of Joliet Contractors Ass'n v. N. L. R. B., 7 Cir., 202 F.2d 606, certiorari denied 346 U.S. 824, 74 S.Ct. 40, 98 L.Ed. 349, cited by respondents in support of their view, concerns itself with the question whether the maintenance of union bylaws directed at prospective employers can constitute a violation of the Act. No picketing was involved in that case, and the present issue was not decided. There the basis of decision was not whether the union's efforts were successful, but whether the actions induced or encouraged were concerted activities undertaken in the course of the employees' employment.

Our recent decision in Douds v. Local 50, Bakery and Confectionery Workers International Union, 2 Cir., 224 F.2d 49, also cited by respondents, concerns an alleged violation of § 8(b)(4)(C) of the Act, the section applicable to picketing for the purpose of forcing an employer to recognize a labor organization after another such organization has been properly certified. In that case we found that the picketing involved was not intended to induce present concerted action, but rather to propagandize and recruit members for the picketing union with an aim to representing a majority of employees in the future. It was there argued that, since the union must be held to intend the foreseeable consequences of its conduct, an illegal intent might be "presumed" from the mere fact of picketing. But we said that such a presumption was hardly valid where the consequences did not in fact follow. This is far from saying that under no circumstances can an illegal intent be found unless the intent is translated into an actual work stoppage.

■ Respondents further contend that the strikes at the Stadium and Rink may be justified by application of the "situs of dispute" doctrine, approved by us in N. L. R. B. v. Service Trade Chauffeurs, Salesmen & Helpers, Local 145, 2 Cir., 191 F.2d 65, 68. This doctrine protects strikes in some cases at a location where the struck employer is engaged in normal business, though such location is not his main place of business and is the place of business of some secondary employer. Tests to determine when the doctrine shall apply are laid down in Moore Dry Dock Co. (Sailors' Union of the Pacific), 92 N.L.R.B. 547, and have been widely approved in the cases. See N. L. R. B. v. Service Trade Chauffeurs, Salesmen & Helpers, Local 145, supra, 2 Cir., 191 F.2d 65. Piezonki v. N. L. R. B., supra, 4 Cir., 219 F.2d 879; N. L. R. B. v. Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 135, 7 Cir., 212 F.2d 216; N. L. R. B. v. Local Union No. 55, 10 Cir., 218 F.2d 226.

In our case the picketing does not come within the approved area of exception defined by the Moore Dry Dock criteria because neither the Stadium nor the Rink was at any time the situs of the dispute between the union and Gotham.

**906**

The musicians worked at the studio, which could be readily, and in fact was, picketed. The musicians never worked at either of the secondary locations, and there was no connection between the musicians and broadcasts made from the Stadium or the Rink.

In N. L. R. B. v. General Drivers, Warehousemen & Helpers, Local 968, 5 Cir., 225 F.2d 205, 210, because of extraordinary circumstances surrounding the labor dispute, the Fifth Circuit departed from a purely mechanical application of the Moore Dry Dock doctrine. There the four truck drivers and warehousemen involved in the dispute were employed for the most part at their employer's warehouse and only occasionally made deliveries at the various construction projects where the great majority of their fellow employees worked. Employees of other contractors also worked at these construction sites. The union representing the four employees called a strike and commenced to picket at both the warehouse and the common construction sites. The Labor Board concluded that the picketing at the common sites was illegal, since only the warehouse was the "situs" of the dispute. But the Court of Appeals reversed, holding that a too mechanical application of the "situs" doctrine could not be permitted to override the statutory purpose to preserve the right to conduct a primary strike. It concluded that widespread court approval of the Moore Dry Dock criteria was necessarily based upon substantial evidence that the unlawful objective denounced by the statute actually existed. The opinion points out that under the circumstances of that case:

"Unless the truck drivers and warehousemen, only four in number, could persuade the other employees of Otis Massey to decline to do their employer's installation work until the strike was settled, it is obvious that the strike was foredoomed to failure from its inception, for picketing only at the warehouse 'situs' where such other employees almost never came was but a useless and futile gesture."

The court there noted that the union was scrupulously careful to inform the secondary employers, the public, and the employees approaching the picket line (by signs, handbills, or verbal statements) that the dispute in no way involved any secondary employers. But here the considerations which led the Fifth Circuit to look beyond a determination of the "situs" of the dispute do not exist. It was clearly not necessary for the respondent union to picket the common premises in order to reach the other employees of the primary employer. At most three of these other employees worked at the common premises—the Stadium or the Rink—while some sixty-five Gotham employees were employed at the studio of WINS, which respondent union was picketing. Furthermore, the few Gotham employees who ever went to the common premises spent a portion of their working time at WINS and hence could be reached by picketing there. In addition, unlike the General Drivers situation, where the striking workers sometimes were present at the common premises making deliveries, here the musicians never worked at the common premises.

There is another point of material distinction between the two cases in that here respondents sought to involve secondary employers in the dispute with Gotham, while in the General Drivers case the strikers took positive steps to confine the dispute solely to the primary employer. We have no reason to conclude that the respondent union's right to conduct a primary strike has been inordinately infringed by the prohibition of picketing at the common premises. Under the circumstances here presented the right to conduct a primary strike can be fully exercised by activity at the situs of the dispute, the radio studio. The rationale of the General Drivers decision is entirely absent.

■ Respondents further contend that neither exhibition baseball nor exhibition boxing constitutes interstate

commerce, and hence the secondary boycott provisions of the Act do not cover the business of the Yankee Baseball Club or of the Parkway Sporting Club. Although respondents do not argue that the business of Gotham is outside the coverage of the Act, they assert that the business of the primary employer is of no significance in determining the jurisdiction of the Board in secondary boycott matters. Since this contention was not raised before the Trial Examiner and the Board, we are directed by § 10(e) of the Act not to consider it unless the neglect to raise it is excused because of extraordinary circumstances. Such circumstances are entirely lacking here. Marshall Field & Co. v. N. L. R. B., 318 U.S. 253, 255, 63 S.Ct. 585, 87 L.Ed. 744; N. L. R. B. v. American White Cross Laboratories, 2 Cir., 160 F.2d 75, 78 note 4; N. L. R. B. v. Pappas & Co., 9 Cir., 203 F.2d 569, 570–571.

■ But in any event, the objection has little merit. There is nothing to suggest that the Yankees, Parkway, and the other secondary employers protected by the Board's order are not engaged in activities "affecting commerce" within the meaning of §§ 2(7) and 10(a) of the Act. Cases cited by respondents determining the scope of coverage of the Sherman Anti-Trust Act, 15 U.S.C. § 1, are not necessarily controlling of matters under the National Labor Relations Act, §§ 2(6), 2(7), and 10(a). See Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898, 26 A.L.R. 357; Toolson v. New York Yankees, 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64. But see United States v. International Boxing Club of New York, 348 U.S. 236, 242, 75 S.Ct. 259; United States v. Shubert, 348 U.S. 222, 230, 75 S.Ct. 277. Further, some of the secondary employers doing business at the Yankee Stadium and Parkway Rink were newspapers, wire services, photographers, telegraph companies, certain refreshment vendors and others, the interruption of whose activities by a work stoppage would "affect commerce" within the

meaning of §§ 2(7) and 10(a) of the Act. Polish National Alliance of United States of North America v. N. L. R. B., 322 U.S. 643, 647–648, 64 S.Ct. 1196, 88 L.Ed. 1509; International Brotherhood of Electrical Workers, Local 501 v. N. L. R. B., 2 Cir., 181 F.2d 34, 36–37, affirmed 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299; N. L. R. B. v. Dixie Terminal Co., 6 Cir., 210 F.2d 538, 539, 43 A.L.R.2d 902, certiorari denied Dixie Terminal Co. v. N. L. R. B., 347 U.S. 1015, 74 S.Ct. 871, 98 L.Ed. 1138; Id., 348 U.S. 952, 75 S.Ct. 440.

■ In any event it is doubtful under the Act whether coverage of the secondary employer need be established independent of coverage of the primary employer. Respondents do not deny that there was proper jurisdiction over Gotham. They contend, however, that the secondary boycott provisions of the Act are intended solely for the protection of the secondary employer and that the business of the primary employer should not be considered in determining jurisdiction of secondary boycotts. We think the better view is that the secondary activity is but an extension of the labor dispute with the primary employer and that the businesses of both employers are to be considered in determining jurisdiction of the secondary activity. The opposite conclusion would require the fragmenting of the authority of the Board over labor disputes—a result which, lacking specific legislative command, we should shun. See Truck Drivers Local Union 649 (Jamestown Builders Exchange), 93 N.L.R.B. 386; McAllister Transfer, Inc., 110 N.L.R.B. 1769.

Respondents also claim that their activities were directed to secondary employers, and not to employees, and were therefore not illegal. See Rabouin v. N. L. R. B., supra, 2 Cir., 195 F.2d 906, 911–912. But as we have already pointed out, the Board was justified in finding that the picketing at the Stadium and the Rink was in part at least intended to influence employees at those locations.

The petition for enforcement of the Board's order is granted.