NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERNATIONAL HOD CARRIERS,
BUILDING AND COMMON LABOR-
ERS' UNION OF AMERICA, LOCAL
NO. 1140, AFL–CIO, Respondent.

No. 16538.

United States Court of Appeals
Eighth Circuit.

Dec. 22, 1960.

Allan I. Mendelsohn, Atty., N. L. R. B., Washington, D. C., for National Labor Relations Board. Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., and Richard J. Scupi, Attys., N. L. R. B., Washington, D. C., on the brief.

Mozart G. Ratner, Washington, D. C., for respondents. David D. Weinberg, Omaha, Neb., on the brief.

Before WOODROUGH, VAN OOSTERHOUT, and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

This is what is commonly referred to as a secondary boycott case. Gilmore Construction Company was the general contractor for the construction of a new building at South High School, Omaha, Nebraska. Simpson Company was a subcontractor for Gilmore at the project. Upon complaint of Gilmore, the Board filed charges against respondent, herein called "Union," charging that in furtherance of a labor dispute with Simpson, Union had engaged in unfair labor practices within the meaning of § 8(b) (4) (i) and (ii) (B) of the Labor Management Relations Act, 1947, as amended by the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C.A. § 158 (b) (4) (i) (ii) (B), hereinafter referred to as "Act." The same activities of the Union also caused the Board to petition the United States District Court for the District of Nebraska for an injunction (which was granted) and upon stipulation, the parties hereto waived a hearing before a Trial Examiner, and submitted this case to the Board upon certain documents and the transcript of the proceeding in the injunction action, Hugh E. Sperry, Regional Director v. International Hod Carriers, etc., Local 1140. The case is now before us on petition of the Board for enforcement of its order against Union, the Board having found that Union had violated the aforementioned section of the Act.

There is no controversy as to the facts, which disclose that on November 20, 1959, Gilmore had eight subcontractors working on the school building, and among them was Simpson. On that day Simpson hired several non-union "day laborers" through the Nebraska Unemployment Bureau, for work on what was otherwise an all-union project. Union's business agent Otte appeared on the job at about 2:00 P.M. and instructed the non-union laborers to stop work. At the same time he told Joe Tripp, one of Gilmore's laborers, and a member of Union, to discontinue working and Tripp complied. When Simpson's foreman inquired of Otte, "What do we have to do to keep from having a picket put on the job?", he was told to "(m)eet wages and conditions." When the foreman indicated he was willing to pay the men wages based on Union's scale, Otte informed him further "(y)ou will have to pay them all for eight hours, and the company will have to sign a contract with the Union." On the same afternoon, November 20,

Union picketed the job with a sign carrying the legend:

> Simpson Co.
> Refuses to Pay
> Union Wages
> & Conditions
> Laborers Local 1140
> This Dispute With Above
> Employer Only

On the following day, Saturday, November 21, Otte telephoned Mr. Van Scoy, secretary of Gilmore, and advised him the project would be picketed the following Monday unless the non-union laborers were paid union scale for their work the previous day, and Simpson signed a union contract. On the same day, when the owner of Simpson received similar advice from Otte, he agreed to comply with the wage demand but refused to sign a contract.

On Monday, November 23, picketing by Otte brought the project to a standstill as none of the employees of any employer would cross the picket line. On that day, Van Scoy advised Otte that there would be no more non-union laborers on the job, that Gilmore would furnish laborers for all unloading work which Simpson might require, and he requested Otte to discontinue picketing, but Otte refused. When Van Scoy asked Otte, "What do we have to do?" Otte replied, "You will have to get the AGC contractors to blacklist Simpson and not allow him on any of your jobs."[1] Van Scoy further testified that on this occasion Otte stated: "If Kiewit or any other contractor in Omaha had Simpson on his job and he had non-Union laborers [we] would picket the job just the same as [yours]."[2] It also appears without dispute that on the following Friday, November 27, George Gilmore discussed the situation with Leonard Schaeffer, assistant business agent of Union. Apparently Schaeffer was complaining because the injunction proceeding had been instituted, and when Gilmore indicated that such action was necessary to get the pickets off the job, Schaeffer stated: "Well, you can run Simpson Company off the job."

Pickets remained on the job site daily from November 20 to December 4, 1959, when they were removed pursuant to the temporary restraining order issued by the United States District Court for the District of Nebraska.

Upon these facts, the Board found [1] that Union had "induced and encouraged" secondary employees to cease work within the meaning of § 8(b) (4) (i) (B); [2] that there was "coercion and restraint" of a secondary employer within the meaning of § 8(b) (4) (ii) (B); ■ that Union's picketing had the unlawful "secondary boycott" objective of forcing Gilmore to cease doing business with Simpson; [4] that, inasmuch as Union was not certified as the bargaining representative of Simpson's employees, the picketing had the unlawful "recognition" objective proscribed by the Act.

Broadly stated, the question is whether the challenged activities of Union fall within the practices proscribed by § 8(b) (4) (i) and (ii) (B) of the Act. Insofar as pertinent here, that section provides:

> "(b) It shall be an unfair labor practice for a labor organization or its agents— * * *
>
> "(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce * * * to engage in, a strike or a refusal * * * to perform any services; or
>
> "(ii) to threaten, coerce, or restrain any person engaged in commerce * * * where in either case an object thereof is—
>
> * * * * * *

---

1. Van Scoy was president of Associated General Contractors of Nebraska and president of the Omaha Employers Association of AGC.

2. See N. L. R. B. v. International Hod Carriers, etc., 8 Cir., 285 F.2d 394, in

which Union concededly engaged in unlawful conduct proscribed by § 8(b) (4) (A) and (B) of The Labor Management Relations Act of 1947. There, Peter Kiewit Sons' Company was the secondary employer.

"(B) forcing or requiring any person to * * * cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of § 9 * * * *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." [3]

The narrow question is,—what was the *real* purpose of the challenged conduct? Union contends that the picketing was primary, aimed solely at Simpson, and that viewing the record as a whole, there is no substantial evidence to support the Board's findings. To implement this assertion, the argument is advanced that Union was engaged in a primary labor dispute with Simpson, which in essence involved Simpson's method of employing casual laborers. In the words of Union's brief: "The Union demanded that Simpson sign a contract binding itself, inter alia, to hire such laborers, when it needed them, through the Union hiring hall; Simpson refused. The Union picketed to induce Simpson to yield."

■ While it has long been recognized that picketing, otherwise lawful, will not run afoul of the statute simply because employees of neutral employers *do* honor the picket line, and that this is one of the lawful benefits which may be expected to accrue from such union activities, nevertheless, § 8(b) (4) (i) (ii) (B) specifically sets out the legal limits of such picketing, i. e. the union may not "induce, coerce, or restrain" neutral employees or employers with the unlawful object of effecting secondary boycotts.

■ The issue we have for determination is less complicated in instances in which the picketing is directed against the primary situs of the dispute, but becomes more difficult of resolution when a common situs is involved. Concededly, this is a "common situs" case, i. e., one where a neutral employer is engaged along with the primary employer, in different activities on the same premises. National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284, presented such a situation. The Supreme Court sustained the Board in its finding that the strike had a proscribed object and came within the ambit of § 8(b) (4) (A), the predecessor to § 8(b) (4) (i) and (ii) (B), stating, 341 U.S. at page 692, 71 S.Ct. at page 953:

"In the views of the Board as applied to this case we find conformity with the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own."

To resolve the numerous problems which stem from common situs activities, and in order to protect the Union's right to carry on its lawful activities against the primary employer, as well as to adequately protect the neutral employers and employees, strangers to the dispute, certain evidentiary standards were evolved for distinguishing between primary and secondary picketing at a common situs. These may be stated as the "Moore Dry

3. By the 1959 amendments, the scope of the prohibition against conduct aimed at achieving unlawful objectives proscribed by the Act, has been broadened. Under § 8(b) (4) of the 1947 Act, the inducement of "employees" to engage in a "concerted refusal" to perform services was prohibited, whereas under § 8(b) (4) (i) of the 1959 Act, inducing or encouraging an *individual* employee to refuse to work,

is also proscribed. Additionally, we observe that whereas the 1947 Act aimed at prohibiting secondary boycotts by outlawing inducement of employees of a neutral employer to cease work, the 1959 amendment, § 8(b) (4) (ii), broadens the scope of the prohibition by making it unlawful to "threaten, coerce, or restrain *any person* engaged in commerce." (Emphasis supplied).

Dock tests," Sailors' Union of the Pacific, AFL and Moore Dry Dock Company, 92 N.L.R.B. 547. Under the situation presented in that case, the Board ruled that picketing the premises of a secondary employer is primary if it meets the following conditions:

"a) The picketing is strictly limited to times when the *situs* of dispute is located on the secondary employer's premises; b) at the time of the picketing the primary employer is engaged in its normal business at the *situs*; c) the picketing is limited to places reasonably close to the location of the *situs*; and d) the picketing discloses clearly that the dispute is with the primary employer."

The Union argues that all of these tests were met in this instance—*ergo*. the picketing was lawful.

There is much discussion by the parties as to the second test, i. e., whether Simpson was engaged in its normal business at the construction site; the Board urges that it was not—that no employees within the Union's jurisdiction were at work upon the project after the first day of picketing, and that picketing could have no meaningful appeal to other employees of Simpson. On the other hand, the Union urges that Simpson was very much "on the job"; that its materials and other workmen remained upon the project, that the dispute was a continuing one, and that Simpson would be free to hire other casual laborers at any time. Union rests its position on our holding in Local 618, etc. v. National Labor Relations Bd., 8 Cir., 249 F.2d 332, and the cases of Seafarers International Union, Etc. v. N. L. R. B., 105 U.S.App.D.C. 211, 265 F.2d 585, and National Labor Relations Bd. v. General Drivers, Etc., 5 Cir., 225 F.2d 205, certiorari denied 350 U.S. 914, 76 S.Ct. 198, 100 L.Ed. 801. Local 618, supra, while not entirely inapposite, has features which render it clearly distinguishable. There, the picketing was carried on at the premises of the primary employer, so that a "primary" rather than a "common" situs situation existed

and this feature caused the court to make this observation, 249 F.2d at page 336:

"We emphasize that in our present case the strike was at the business situs of the struck employer. The legality of the strike and picketing at all stations prior to August 8, 1955, is conceded, and the legality of the strike and picketing at the stations other than Manchester subsequent to August 8, 1955, is not questioned."

In Local 618, we held that the temporary cessation of picketing of the primary employer's premises did not change the character of the picketing when resumed, so that it could properly be said that it was for an illegal purpose. In other words, the previous legal activity was not transformed into unlawful conduct because the primary employees were temporarily removed from the premises. It may well be that under proper circumstances temporary removal of primary employees from premises occupied by secondary employers and employees will not transform a picket line from a legal one to an illegal one, but we are satisfied that on this record that rule has no application. The facts in Seafarers International Union, supra, and General Drivers, Etc., supra, are likewise distinguishable. In those cases, it appears there was a total absence of proof of unlawful encouragement, coercion, etc., of secondary employees, and further, that the labor organizations there involved took affirmative action to make it clear that their picketing was directed solely at the primary employer.

Apart from the fact that the above cases are factually dissimilar, it is our view that Union assumes too much by proceeding upon the theory that the Moore Dry Dock tests are the single guide for our decision. It must be remembered that these tests were set up for the purpose of determining the character of the picketing, that they are evidentiary in nature, and they are to be employed in the absence of more direct evidence of the intent and purposes of the labor organization. This conclusion is

implicit in the cases relied upon by Union, which have accorded wide approval of the Moore Dry Dock tests, National Labor Relations Bd. v. Associated Musicians, 2 Cir., 226 F.2d 900, 906, certiorari denied 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483; Piezonki v. National Labor Relations Board, 4 Cir., 219 F.2d 879, 881; National Labor Relations Bd. v. General Drivers, Etc., supra, 225 F.2d at page 209; National Labor Rel. Bd. v. Chauffeurs, Teamsters, Etc., 7 Cir., 212 F.2d 216, 219; National Labor Relations Board v. Local Union No. 55, 10 Cir., 218 F.2d 226, 231; Seafarers International Union, Etc., v. N. L. R. B., supra, 265 F.2d at pages 591–592; and indeed in the Moore Dry Dock case itself, 92 NLRB at pages 550–551.

■ In the case before us, there was ample direct, and uncontradicted evidence pointing to the intent of Union, and we believe the Board could have arrived at no other conclusion than that the activities here were intended to "induce and encourage" secondary employees to cease work; to "coerce and restrain" Gilmore; to force Gilmore to cease doing business with Simpson; and to bring about the unlawful "recognition" objective proscribed by the Act, § 8(b) (4) (i) (ii) (B).

■ In the alternative, Union asserts that it had the right to picket Gilmore as a primary employer under the "ally doctrine," see National Lab. Rel. Bd. v. Business Mach. & Office A., Etc., 2 Cir., 228 F.2d 553, certiorari denied 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483. This point is based upon Gilmore's offer to supply its own laborers whenever needed by Simpson for the purposes of unloading trucks, etc.

This contention was not advanced before the Board, and the Union has raised the issue for the first time on this appeal. Section 10(e) of the Act, 29 U.S.C.A. § 160(e), provides that, absent extraordinary circumstances, "No objection that has not been urged before the Board * * * shall be considered by the court," and the failure to raise such issue precludes Union from raising it here. See National Labor Relations Board v. Cheney Cal. Lumber Co., 327 U.S. 385, 388–389, 66 S.Ct. 553, 90 L.Ed. 739; Marshall Field & Co. v. National Labor Relations Board, 318 U.S. 253, 255, 63 S.Ct. 585, 87 L.Ed. 744; National Labor Relations Bd. v. Associated Musicians, supra, 226 F.2d at page 907.

The Union also attempts to attack the Board's conclusions as to the weight and portent of the undisputed evidence, asserting as one point, that there was no evidence that Union knew that Tripp was an employee of Gilmore, and that the Board failed to specifically find that Union induced an *employee*, i. e., Tripp to cease work. Obviously, this is a grasping for straws. The Board's findings were:

"In view of Otte's instruction to secondary employee Tripp to stop working on the very first day of the picketing, and the fact that the picketing continued after the primary Simpson employees were no longer on the job and Respondent had been told by Gilmore that they would not be used on the job again, we find that the Respondent 'induced and encouraged' secondary employees to cease work within the meaning of Section 8(b) (4) (i) (B)."

While there is no direct evidence to establish that Otte knew that Tripp was a Gilmore employee, it is undisputed that Tripp was a member of Union, and since Union's grievance with Simpson sprang from the latter's failure to employ union laborers, the logical deduction is that Otte knew that Tripp was not employed by Simpson. At the time of the incident Tripp was assisting another Gilmore employee in unloading a truck. The aggregate of these circumstances would cause any prudent person to at least make further inquiry before pursuing the rather drastic course followed by Otte.

In any event, in view of the evidence heretofore discussed, it seems clear beyond question that secondary *employees* were induced to cease work, within the meaning of the Act, and Tripp's employment status, as such, is immaterial.

Union also attempts to demonstrate the legality of its objectives by citing us to § 8(f) of the 1959 amendments, which in summary provides that it shall not be an unfair labor practice under subsections (a) and (b) of § 8 for a labor organization and an employer engaged primarily in the building and construction industry, to enter into a hiring-hall agreement. Although Congress has given validity to such an agreement, *voluntarily* entered into by the parties, we find no congressional approval of the use of strikes or picketing to compel execution of a prehire agreement. Indeed, the legislative history indicates the contrary to be true. The Conference report which deals with the subject, states: "The conference adopted the provision of the Senate bill permitting prehire agreements in the building and construction industry. Nothing in such provision is intended to restrict the applicability of the hiring hall provisions enunciated in the Mountain Pacific case (119 N.L.R.B. 883, 893) *or to authorize the use of force, coercion, strikes, or picketing to compel any person to enter into such prehire agreements.*" (Emphasis supplied). See U.S.Code Congressional and Administrative News, 86th Cong. 1st Sess., 1959, at page 2514. National Labor Relations Board v. Drivers Local Union No. 639, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710, relied on by Union, is inapposite. There the question was whether peaceful picketing by a union, which did not represent a majority of the employees, constitutes restraint or coercion of *employees* in the exercise of their rights guaranteed by § 7, thus being an unfair labor practice under § 8(b) (1) (A) of the Act of 1947.

Inasmuch as the evidence here fully supports the finding that Union was engaged in secondary boycott activities, in violation of the Act, we need not deter-

mine the area of Union's rights, as against Simpson, the primary employer, since § 8(b) (4) (i) (ii), specifically outlaws secondary picketing when its purpose is to force the employer to bargain with the union as the representative of his employees, unless the union has been certified by the Board. It was stipulated here that Union was not so certified.[4]

■ Union also asserts that the comments made to Gilmore did not constitute threats or coercion, but were merely privileged statements of a lawful position. There is no merit in this contention. "Requests and threats addressed * * * to employers, even though not illegal in themselves * * * may be considered in determining the motives for picketing." National Labor Relations Bd. v. Associated Musicians, supra, 226 F.2d at page 904. In determining whether the picketing here involved was for unlawful purposes proscribed by the Act, it need only be said that the comments and statements of Union agents speak for themselves.

The order entered by the Board directs Union to cease and desist from:

"Engaging in or inducing * * * employees of Gilmore Construction Company, *or any other employer,* to engage in strikes or refusals in the course of their employment * * * to perform any services, or to threaten, coerce, or restrain Gilmore Construction Company, *or any other employer* * * * where an object thereof is to force or require Gilmore Construction Company, *or any other employer* or person, to cease doing business with Simpson Company (or any other employer), or an object thereof is to force or require Simpson Company, (or any other employer), to recognize or bargain with the Respondent, in the absence of a certification as bargaining rep-

4. § 8(b) (7), added by the 1959 amendment, provides new limitations upon picketing for the object of forcing or requiring an employer to recognize or bargain with a labor organization unless such labor organization is certified as the repre-

sentative of the employees involved. For discussion of "organizational" and "recognitional" picketing, see National Labor Relations Board v. Drivers Local Union, supra, 362 U.S. at pages 282–292, 80 S. Ct. 706.

resentative of the employees of such employer." (Emphasis and parentheses supplied).

Union contends that the Board's order is too broad in two respects: (1) it fails to provide that Union shall have the right to engage in primary strikes and primary picketing against Simpson, and (2) it encompasses not only Gilmore and his subcontractors on the school project in Omaha, Nebraska, but other employers.

■ In amending § 158(b) (4) of the Act, Congress made it clear that it was not attempting to prevent lawful primary picketing or primary striking. See proviso to § 158(b) (4) (ii) (B) of the 1959 amendment. However, we cannot agree that, unless the language of the proviso is incorporated in the order, Union's rights, as clearly safeguarded by the statute, will in any way be impaired. By explicit terms, the order is designed to prohibit only that conduct which is proscribed by the statute, that is, picketing or striking for an unlawful purpose. We cannot perceive of anyone suggesting that the order can rationally be construed to prohibit lawful primary picketing or lawful primary striking.

■ While there is more substance to Union's second objection, it cannot be sustained in its entirety. In case No. 16,511, opinion filed this day, 285 F.2d 394, another action against Union, the sole question presented involved the validity of the broad order. There, unlike the instant situation, the Board did not find that Union had pursued other unlawful practices, neither was there any evidence of a clear purpose to violate the Act or an intention to do so in the future.[5] Here we have probative evidence indicating that Union has engaged in prior illegal conduct of the same or similar type forming the basis for the instant charge. Indeed, in No. 16,511, supra, Union in effect conceded on appeal

that its picketing of the project was for an unlawful purpose proscribed by § 8 (b) (4) (A) and (B) of the Act and that an appropriate order should be entered. It is not without significance that the instant unfair labor conduct had its inception approximately 7 months after the incident in No. 16,511, supra, (April 27, 1959) and that in both instances the same pattern of action was pursued by Union. We are also mindful that in International Brotherhood of Teamsters, Etc., 116 N.L.R.B. 461, Union was found to have engaged in unlawful picketing and secondary activities directed against numerous contractors in connection with its primary dispute with the Ready Mixed Cement Company.

Thus we have not only prior violations but, as we have seen, threats of future transgressions which are sufficient to demonstrate to us a proclivity for unlawful conduct requiring the imposition of an order which will prohibit Union from exerting pressure not only upon Gilmore but upon other neutral employers for purposes declared unlawful by § 8(b) (4) (i) and (ii) (B). International Brotherhood of Electrical Workers, etc. v. National Labor Relations Board, 341 U.S. 694, at pages 705, 706, 71 S.Ct. 954, 95 L.Ed. 1299; National Labor Relations Board v. Express Pub. Co., supra, 312 U.S. 426, 61 S.Ct. 693. However, upon the record before us, we observe that the threats of future unlawful activities were directed and confined solely to Union's grievance with Simpson Company; therefore, that portion of the order included in parentheses, "or any other employer" following the words "Simpson Company" being without factual support, should be stricken. Compare N. L. R. B. v. United Brotherhood of Carpenters, Etc., 7 Cir., 276 F.2d 694; N. L. R. B. v. Bangor Building Trades Council, AFL–CIO, 1 Cir., 278 F.2d 287, 291.

---

5. See Communications Workers of America v. N. L. R. B., 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896; National Labor Relations Board v. Express Pub. Co., 312 U.S. 426, 433, 61 S.Ct. 693, 85 L.Ed. 930; May Department Stores Co. v. National Labor Relations Board, 326 U.S. 376, at pages 388–392, 66 S.Ct. 203, 90 L.Ed. 145.

The order is modified by striking the words "or any other employer" appearing in parentheses in the order above quoted, and following the words "Simpson Company," and as so modified the order will be enforced.