Merle D. VINCENT, Jr., Regional Director of the Third Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 25, NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES & TECHNICIANS, AFL–CIO–CLC, Respondent.

Civ. No. 1970–588.

United States District Court, W. D. New York.

Jan. 12, 1971.

David W. Larrison, N. L. R. B., Buffalo, N. Y., for petitioner.

Taft, Stettinius & Hollister, Cincinnati, Ohio (Frank H. Stewart and Arnold J. Schwartzman, Cincinnati, Ohio, of counsel), for charging party.

Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y. (Eugene W. Salisbury, Buffalo, N. Y., of counsel), for the respondent.

CURTIN, District Judge.

The petitioner seeks injunctive relief pursuant to Section 10($l$) of the National Labor Relations Act, as amended (29 U.S.C. § 160($l$)), restraining the respondent from engaging in alleged unfair labor practices within the meaning of Section 8(b) (4) (i), (ii) (B) of the Act, pending the Board's final disposition of the charge filed by WGR Radio.

After a hearing held on December 28, 1970, the court considered briefs filed by the parties. The following constitutes the court's findings of fact and conclusions of law.

WGR, owned by Taft Broadcasting Company, Inc. [Taft], operates a radio and TV station at 184 Barton Street, Buffalo, New York. The respondent, Local 25, National Association of Broadcast Employees & Technicians, AFL-CIO-CLC [NABET], is the collective bargaining agent of WGR employees. On or about November 5, 1970, a collective bargaining agreement between Taft and NABET expired. On November 26, 1970, WGR employees went on strike, apparently as a result of a breakdown in collective bargaining negotiations.

WGR has a contract with the Buffalo Sabres hockey team to broadcast the home games of the Sabres during the 1970–71 season. The contract covers games played in the Buffalo Memorial Auditorium. Before the season began, WGR technicians installed equipment owned by WGR in the Auditorium. A telephone line carries the signal from the Auditorium to the WGR Barton Street Studio where it is broadcast. Section 7 of the WGR-Sabres contract provides that, at all home games, one of the announcers or commentators would be "Phil Soisson (a staff announcer for WGR for many years) or such other regular employee of WGR as shall be designated by (WGR) and approved by (the Sabres)." The announcer was to

be paid by the Sabres. Mr. Soisson, a NABET member, worked the first nine games as color commentator and was paid directly by the Sabres. After his last broadcast on November 15, 1970, his duties were taken over by a Sabre employee.

NABET pickets first appeared at the Auditorium on November 26, 1970 shortly before a Sabre game. They patrolled the public entrances, bearing signs reading "On Strike against WGR—N.A.B.E.T." and "Strike against Taft Broadcasting—WGR—N.A.B.E.T." In similar fashion, NABET pickets appeared at the public entrances of the Auditorium shortly before, during and after Sabre home games at the Auditorium during December, 1970 and until the present time. These games were all broadcast over WGR. During the picketing, no approach was made to any person entering the Auditorium. No mass picketing developed. There was no solicitation of any of the Sabre employees, the ticket takers, ushers, or any customers coming to the games. In fact, NABET took steps to make sure that Sabre employees understood that NABET activities were directed against WGR only. On November 26, 1970, Mr. Soisson called the Union representative of the Auditorium ticket takers and ushers to assure him that NABET did not want to interfere with the Sabre games in any way.

During the evening of December 2, 1970, James Fagan, NABET Local 25 President, called David Forman, Administrative Vice President of the Sabres, on the telephone. Mr. Fagan told Mr. Forman that, if WGR continued to broadcast the Sabres' games, NABET planned to picket the Auditorium. He said that this action was not aimed at the Sabres, but only at WGR. He pointed out that there was a possibility that the picketing might influence TV crews of out-of-town stations not to work. He explained the reasons for the strike to Mr. Forman. Then Mr. Fagan asked if the Sabres could transfer the broadcast of the games to another station. Mr. Forman explained that this could not be done since the Sabres had a contract with WGR. The following morning, NABET pickets appeared at 10:00 A.M., although the game was not scheduled to begin until 8:00 P.M. that evening. Some employees of a construction company engaged in renovation work at the Auditorium refused to return to work after the noon break. NABET's reason for picketing at that hour was that, at that time, it believed that the TV crews setting up were doing work usually performed by WGR employees. When it was learned that this was not the case, the pickets were withdrawn. Subsequent picketing only occurred shortly before, during, or shortly after the WGR broadcast of the Sabre games. NABET concedes that the December 3 morning picketing of the Auditorium was forbidden by the Act.

■ In order to obtain a 10(l) injunction, the petitioner must satisfy the court by the evidence produced at the hearing that there is reasonable cause to believe that the elements of an unfair labor practice are present. See McLeod for and on Behalf of N.L.R.B. v. Local 282, International Bro. of Teamsters, 345 F.2d 142 (2d Cir. 1965). The court should grant an order which is just and proper under the circumstances. See Douds v. Milk Drivers and Dairy Employees Union, Local 584, 248 F.2d 534, 537 (2d Cir. 1957).

■ It is the Board's position that the described activities of NABET constituted a secondary boycott. The Board argues that the NABET picketing and the telephone conversation of Mr. Fagan with Mr. Forman had the object of forcing the Sabres to terminate business with WGR. The Board argues that the Auditorium was definitely a secondary situs since WGR did not have presence at the Auditorium during the games.

The respondent Union argues that its picketing was not at a secondary situs or, in the alternative, that the picketing was at an ambulatory situs and conforms to the rule of Sailors Union of the Pacific (Moore Dry Dock), 92 N.L.R.B. 547.

The court finds that, upon the circumstances presented, during the broadcast of the games at the Auditorium WGR had a temporary or ambulatory situs at the Auditorium.

In support of its petition, the Board relies strongly on National Labor Relations Board v. Associated Musicians, 226 F.2d 900 (2d Cir. 1955). However, there are a number of material distinctions between that and the instant case. In *Associated Musicians,* the striking musicians were employees of a radio station which had contracts to broadcast certain baseball games and boxing exhibitions. However, the work of the musicians was performed at the radio station and not at the baseball stadium or fight ring. In addition, the picketing in that case occurred not only at the public entrances to the stadium, but also at the entrances used by employees and concessionaires. Further, the conversations between the Union and the stadium owner in that case clearly indicated that the Union was trying to put pressure upon the secondary employer, for the purpose of causing the employer in turn to threaten the radio station with loss of business unless it came to terms with the Union. The court in that case held that the stadium and the ring were not the situs of the dispute between the parties.

In the instant case, the picketing on the morning of December 3, 1970 falls within the ruling of the *Associated Musicians* case and is prohibited.

 The picketing at game time is justified by the application of the criteria of *Moore Dry Dock, supra.* This requires: (1) That the picketing be limited to times when the situs of dispute was located on the secondary premises; (2) That the primary employer be engaged in his normal business at the situs; (3) That the picketing take place reasonably close to the situs; and (4) That the picketing clearly disclose that the dispute was only with the primary employer. Where the situs of the primary employer is ambulatory, "there must be a balance between the Union's right to picket and the interest of the secondary employer in being free from picketing." See Local 761, International Union of Electrical, Radio & Machine Workers, AFL–CIO v. National Labor Relations Board, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961).

In making this determination, the court has carefully taken into consideration the conversation between Mr. Fagan and Mr. Forman and all of the other described activities. Under the circumstances, it appears that the conversation was not intended to put pressure on the Sabres to terminate the contract with WGR, and was not taken in that light by Mr. Forman. Furthermore, the Union carefully informed other employees of the Sabres that the thrust of the picketing was directed against WGR and not against the Sabres.

Therefore, the court finds that the picketing which occurred during the morning of December 3, 1970 is prohibited by the Act and is enjoined. However, picketing shortly before, during, and after WGR broadcasts of the Sabres games at the Auditorium is not prohibited and is not enjoined.

So ordered.